FILED
2024 Mar-20  PM 01:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MOHAMMAD SHARIFI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:17-cv-01924-AMM** |
| | ) | |
| **TERRY RAYBON,** | ) | |
| **Warden of William C. Holman** | ) | |
| **Correctional Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Mohammad Sharifi petitions this court for a writ of *habeas corpus* under 28 U.S.C. § 2254, challenging his 2005 capital murder conviction and death sentence in the Circuit Court of Madison County, Alabama. Doc. 1. Mr. Sharifi alleges that various constitutional violations mandate the reversal of his conviction and sentence and requests an evidentiary hearing. *See generally id.* The parties have fully briefed Mr. Sharifi's claims. Docs. 1, 15, 16, 22, 106, 115. Because Mr. Sharifi has not established that he is entitled to an evidentiary hearing or habeas relief, his petition is **DENIED**.

# **Table of Contents**

| | | |
|---|---|---|
| **I.** | **Background** ................................................................................................ 3 |
| | **A.** The Murders ........................................................................................ 3 |
| | **B.** Pretrial Procedure ............................................................................... 5 |
| | **C.** Trial Procedure .................................................................................... 6 |
| | **D.** Sentencing ........................................................................................... 7 |
| | **E.** Subsequent Proceedings .................................................................... 8 |
| |     **1.** The Direct Appeal ........................................................................ 8 |
| |     **2.** The Rule 32 Petition .................................................................. 10 |
| |     **3.** The Habeas Petition ................................................................... 14 |
| **II.** | **Legal Standards** .................................................................................... 14 |
| | **A.** Exhaustion of State Court Remedies ............................................... 15 |
| | **B.** The Procedural Default Doctrine .................................................... 16 |
| | **C.** Overcoming Procedural Default – Cause & Prejudice .................. 17 |
| | **D.** The Statutory Overlay: AEDPA & Habeas Review ...................... 18 |
| | **E.** Burden of Proof & Heightened Pleading Standards for Habeas Review ................ 19 |
| | **F.** Claims of Ineffective Assistance of Counsel ................................. 21 |
| **III.** | **Analysis of Mr. Sharifi's Claims** ....................................................... 24 |
| | **A.** Constitutionality of AEDPA ........................................................... 24 |
| | **B.** Due Process Claims .......................................................................... 26 |
| |     **1.** Mr. Sharifi's right to a speedy trial ......................................... 26 |
| |     **2.** Mr. Sharifi's absence from various court proceedings ............ 51 |
| |     **3.** Mr. Sharifi's presentation of mitigation evidence ................. 53 |
| |     **4.** Admission of Ms. Smith-Sharifi's autopsy report .................. 60 |
| |     **5.** Mr. Sharifi's opportunity to testify ......................................... 70 |
| |     **6.** Failure to charge the jury on lesser included offenses ........... 71 |
| | **C.** Ineffective Assistance of Counsel Claims ...................................... 76 |
| |     **1.** Failure to protect Mr. Sharifi's right to testify ..................... 80 |
| |     **2.** Counsel's effectiveness in the penalty and sentencing phases ........ 81 |
| |     **3.** Counsel's effectiveness in the guilt / innocence phase ......... 83 |
| | **D.** Constitutionality of Mr. Sharifi's Death Sentence ...................... 90 |
| **IV.** | **Mr. Sharifi's Request for an Evidentiary Hearing** .......................... 94 |

**V.   Conclusion** ...................................................................................................................96

## I.      Background

Mr. Sharifi was indicted, convicted, and sentenced to death for the 1999 murders of Sarah Kay Smith-Sharifi and Derrick Brown. He seeks federal habeas relief from his conviction and sentence. Relevant history is set forth below.

### A. The Murders

In its opinion on direct appeal, the Alabama Court of Criminal Appeals summarized the evidence in this case:

> Sharifi, an Iranian national, came to Huntsville in December 1998 on a six-month tourist visa. Before the visa expired he married Sarah Kay Smith, an American citizen. Following his marriage, Sharifi petitioned to change his immigration status from "tourist" to "legal alien."
>
> Sarah and Sharifi separated in late 1999. Thereafter, Sarah, accompanied by Derrick Brown, met with Sharifi's caseworker at the Immigration and Naturalization Service (now the Department of Citizenship and Immigration Services). As a result of that meeting, Sharifi's petition to become a legal alien was denied, and his immigration status was changed to "illegal alien," because his tourist visa had expired.
>
> Sharifi purchased a .25–caliber pistol on December 6, 1999. On December 13, 1999, Sharifi went to the apartment he had shared with Sarah and forced his way inside. The Huntsville Police were called to the scene, and Sharifi was prevented from removing anything other than his clothes from the apartment. Sharifi left, promising to return. After Sharifi left, Sarah had the locks on the doors

3

to the apartment changed. When Sharifi returned later that same day and discovered that the locks had been changed, he became upset. Sharifi became even more agitated when he learned that although he was not allowed inside the apartment, Derrick Brown was inside. Sharifi demanded of the apartment manager that Brown be removed.

The manager of the apartment complex filed a missing-person report with the Huntsville Police on December 17, 1999, because the manager had not seen Sarah in several days. December 13, 1999, was the last day Sarah and Brown were seen alive. On December 26, 1999, Sarah Sharifi's body was found on the banks of the Tennessee River; it was wrapped in black plastic bags and tied with an electrical cord. On January 1, 2000, Brown's body was found in the Tennessee River; it was partially wrapped in black plastic bags and tied with an electrical cord. Both Sarah and Brown had been shot in the head. Subsequent forensic testing determined that the gun used to shoot both victims was the gun Sharifi purchased in December 1999.

On December 28, 1999, the FBI arrested Sharifi in Los Angeles, California, on an unlawful-flight-to-avoid-prosecution warrant relative to Sarah's murder. In Sharifi's possession at the time of his arrest were the murder weapon, a license tag from Brown's vehicle, Brown's driver's license, one of Brown's credit cards, and a pair of sandals that was later determined to have Sarah's blood on them.

Sharifi was extradited to Alabama and was incarcerated in the Madison County jail awaiting trial for the two murders. During his incarceration, Sharifi met Tasha Borner, another inmate. Sharifi wrote Borner a number of letters professing his love for her and asking her to testify that they were together on the night of December 13, 1999. Borner, who did not meet Sharifi until 2002, turned the letters over to the district attorney and was given a plea deal in exchange for her testimony against Sharifi.

Sharifi's defense was that he was in Los Angeles,
California, at the time of the murders. Aghaishahabdin
Moughari testified that Sharifi came by his house in
Huntsville on December 13, 1999, that Sharifi's car was
loaded with his possessions, and that he told him that he
was moving to California to find work. Moughari also
testified that on December 14, 1999, Sarah came by his
house looking for Sharifi.

Sharifi's father, Hossain Sharifi, testified that at the time
of the murders he was living in Iran and that he spoke to
Sharifi everyday at approximately 2:00 p.m. Huntsville
time. He said that on December 13, 1999, he telephoned
the apartment Sharifi had shared with Sarah, and a man
answered the telephone and gave the phone to Sarah. He
further testified that on December 15, 1999, Sharifi
telephoned him in Iran and told him that he had moved to
California.

*Sharifi v. State* (*Sharifi I*), 993 So. 2d 907, 911–12 (Ala. Crim. App. 2008).

**B. Pretrial Procedure**

On March 1, 2000, the Madison County Circuit Court held Mr. Sharifi's

preliminary hearing. Doc. 1 at 4. Mr. Sharifi was represented by counsel at this

hearing; his counsel changed several times between the preliminary hearing and trial.

*Id.* In February 2004, the trial court appointed Larry Morgan and Alan Mann to

represent Mr. Sharifi, and these attorneys continued to represent Mr. Sharifi through

trial. *Id.*

In March 2001, a grand jury indicted Mr. Sharifi on three counts of capital

murder for the shooting deaths of Mrs. Smith-Sharifi and Mr. Brown. Doc. 11-11 at

24–26. At his September 2004 arraignment, Mr. Sharifi pleaded not guilty to all three

counts. Doc. 1 at 4. Before trial, the district attorney elected not to proceed with two of Mr. Sharifi's three capital murder charges. *Id.*; Doc. 11-20 at 18.

Before trial, the trial court "held several hearings on numerous defense motions, including a motion to appoint a Farsi interpreter." Doc. 11-20 at 19. "This motion was granted and a Farsi interpreter from Los Angeles, California was located in May 2004." *Id.* After being certified and sworn in, the interpreter translated simultaneously for Mr. Sharifi at four separate motion hearings in June and September 2004. *Id.*

The case was set for trial and then continued multiple times before ultimately proceeding to trial. *Id.* A September 13, 2004 "continuance was premised upon [Mr. Sharifi's] request." *Id.*

## C. Trial Procedure

Beginning on January 24, 2005, Mr. Sharifi was tried on one count of capital murder under Alabama Code § 13A-5-40(a)(10). Doc. 1 at 4. This statute makes intentional murder capital under Alabama law when "two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct." Ala. Code §§ 13A-5-40(a)(10), 13A-6-2(a)(1). The Farsi interpreter translated for Mr. Sharifi throughout trial. Doc. 11-20 at 19.

"The jury . . . convicted Sharifi of murdering Sarah and Brown during one act or pursuant to one course of conduct," in violation of Alabama Code § 13A-5-

40(a)(10). *Sharifi I*, 993 So. 2d at 911–12. After finding Mr. Sharifi guilty of capital murder, the jury voted on punishment; ten jurors voted in favor of the death penalty, and the two remaining jurors voted for life without parole. Doc. 11-20 at 19.

## D. Sentencing

On March 11, 2005, the trial court conducted a separate sentencing hearing. Doc. 11-20 at 19; Doc. 1 at 4. A pre-sentence investigative report was prepared before the hearing, and at the hearing, Mr. Sharifi and the State of Alabama introduced evidence and made arguments regarding the appropriate sentence. *See generally* Doc. 11-10; Doc. 11-20 at 19. Defense counsel presented mitigation evidence, including testimony from Mr. Sharifi and from his father. Doc. 11-10 at 71–82. A Farsi interpreter was available to translate for Mr. Sharifi throughout the sentencing phase. *Id.* at 68, 71; Doc. 11-20 at 19.

The trial court concluded that the following aggravating circumstance "was proven beyond a reasonable doubt: The Defendant committed the capital offense of murder of two or more persons by one act or pursuant to one scheme or course of conduct." Doc. 11-20 at 20 (emphasis omitted). As required by statute, the trial court considered multiple mitigating circumstances, including the fact that Mr. Sharifi "had no significant history of prior criminal activity." *Id.* at 20–21. The court also considered testimony from Mr. Sharifi's father, his education, his prior military

service, his work history, and the fact that he "has a 12-year old son in Iran and a supportive family." *Id.* at 22.

Ultimately, the trial court accepted the jury's recommendation and sentenced Mr. Sharifi to death. Doc. 11-20 at 22–23; Doc. 1 at 4. The trial court reasoned "that the aggravating circumstances of this offense clearly outweigh any mitigating circumstances . . . even if all the mitigating circumstances put forth by [Mr. Sharifi] were in fact proven." Doc. 11-20 at 22–23.

### E. Subsequent Proceedings

Mr. Sharifi's case has been before the Alabama appellate courts twice — first on direct appeal following his conviction and sentence, and then on appeal from the dismissal of his Rule 32 petition.

### 1. The Direct Appeal

Mr. Sharifi appealed his conviction and sentence to the Alabama Court of Criminal Appeals through new appellate counsel. *Sharifi I*, 993 So. 2d at 911–12. The Court of Criminal Appeals affirmed his conviction and sentence on February 1, 2008, *id.* at 950, and subsequently denied his request for rehearing, *id.* at 907. On May 16, 2008, the Alabama Supreme Court denied certiorari without an opinion. *Id.* On November 3, 2008, the U.S. Supreme Court also denied certiorari without an opinion. *Sharifi v. Alabama*, 555 U.S. 1010 (2008).

Mr. Sharifi raised the following issues on direct appeal: (1) various issues concerning the Vienna Convention on Consular Relations, *Sharifi I*, 993 So. 2d at 913–19; (2) rights arising under a bilateral treaty between the United States and Iran, *id.* at 919–20; (3) rights arising under the International Covenant on Civil and Political Rights, *id.* at 920–21; (4) denial of his right to a speedy trial in violation of the Sixth Amendment to the United States Constitution, *id.* at 921–24; (5) judicial error in declining to strike two jurors for cause, *id.* at 924–26; (6) the State's violation of *Batson v. Kentucky* "by using its peremptory strikes to remove blacks and female prospective jurors from the venire," *id.* at 927–28; (7) judicial error in admitting Ms. Smith-Sharifi's autopsy report in violation of Mr. Sharifi's right to confrontation, *id.* at 928–32; (8) unconstitutionality of Alabama law on diminished capacity, *id.* at 932–33; (9) application of a different burden of proof in capital cases, *id.* at 933–35; (10) judicial error "in failing to instruct the jury on the lesser-included offenses of intentional murder, reckless murder, felony murder, and manslaughter," *id.* at 935–38; (11) judicial error relating to the jury instruction on circumstantial evidence, *id.* at 938; (12) unconstitutionality of the death penalty, *id.* at 938–40; (13) "Alabama's death-penalty statute violates *Ring v. Arizona*," *id.* at 940–41; (14) violation of Mr. Sharifi's due process rights because he was unable to present mitigation evidence, *id.* at 941–42; (15) erroneous jury instructions during the penalty phase, *id.* at 942–46; and (16) because "the cumulative errors affected [Mr. Sharifi's] substantial rights

9

and warrant a new trial," *id.* at 946–47. The appeals court also "review[ed] the record for any 'plain error,'" *id.* at 947–49, and, as required by statute, "review[ed] the propriety of Sharifi's conviction and death sentence," *id.* at 949–50. In administering its "obligation to review the record for any 'plain error,'" the appeals court noted several omissions in the presentence report. *Id.* at 947.

Among these, only issues four, six, seven, ten, thirteen, and fourteen are raised in Mr. Sharifi's federal habeas petition, along with an ineffective assistance of counsel claim based on the presentence report. *See generally* Doc. 1.

### 2. The Rule 32 Petition

On May 3, 2009, Mr. Sharifi filed a post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. Doc. 1 at 5. His original appellate counsel prepared the Rule 32 petition but then withdrew due to a conflict of interest, and Mr. Sharifi submitted the petition *pro se*. *Sharifi v. State* (*Sharifi R.32*), 239 So. 3d 603, 606 n.1 (Ala. Crim. App. 2016). His petition "rais[ed] several claims, including claims of ineffective assistance of counsel." *Id.* at 606. Also in May 2009, Mr. Sharifi filed a *pro se* supplement to his Rule 32 petition. *Id.*; Doc. 11-34 at 165– 202. This first supplement was filed before the court appointed replacement counsel. Doc. 11-60 at 124–25; Doc. 11-35 at 3–24.

In July 2009, Mr. Sharifi obtained replacement counsel, who asked the court for leave to amend the Rule 32 petition. Doc. 11-60 at 125. The court never ruled on

this request, and Mr. Sharifi did not file an amended petition through this counsel. *Id.*

In February 2012, Mr. Sharifi's counsel was replaced again, and his new counsel moved for leave to amend the Rule 32 petition. *Id.*; Doc. 1 at 6. The court granted the request, and Mr. Sharifi filed an amended petition adding new claims on November 30, 2012. *Sharifi R.32*, 239 So. 3d at 606. Mr. Sharifi filed another motion for leave to amend the petition, along with an amended petition, on December 30, 2013. *Id.* That motion was ultimately denied. Doc. 11-60 at 126.

In May 2014, Mr. Sharifi again obtained new appellate counsel. *Sharifi R.32*, 239 So. 3d at 606. This attorney requested an evidentiary hearing, but the court did not grant the request. Doc. 11-60 at 126, 132.

During the pendency of the Rule 32 case – and while represented by counsel – Mr. Sharifi filed multiple *pro se* amendments, motions, pleadings, and letters. *Id.* at 126–29; *Sharifi R.32*, 239 So. 3d at 606. Upon the State's motion, the trial court struck all of these *pro se* filings, with the exception of the original Rule 32 petition and the first *pro se* amendment (filed in May 2009). Doc. 11-60 at 126; *Sharifi R.32*, 239 So. 3d at 607; Doc. 11-53 at 14. The trial court also directed Mr. Sharifi to stop filing *pro se* pleadings. Doc. 11-60 at 126; Doc. 11-53 at 14. This August 14, 2014 order striking the *pro se* pleadings was predicated upon *Belisle v. State*, which holds that "[a] defendant has no right both to represent himself and to have the assistance

of counsel," and a circuit court's refusal to allow a defendant "to act as his own cocounsel" is a proper exercise of discretion. 11 So. 3d 256, 274–75 (Ala. Crim. App. 2007); Doc. 11-53 at 14.

Mr. Sharifi did not comply with this order and continued to file *pro se* pleadings with the trial court; in response, the trial court directed the clerk to strike the *pro se* filings and to exclude them from the record. *Sharifi R.32*, 239 So. 3d at 607.

On June 26, 2015, the trial court dismissed Mr. Sharifi's petition and its amendments. *Sharifi R.32*, 239 So. 3d at 607; Doc. 11-60 at 132. The court held that Mr. Sharifi's claims relating to (a) his counsel's failure to challenge the State's peremptory strikes, (b) his counsel's failure to object to admission of the autopsy report, and (c) violation of Mr. Sharifi's right to a speedy trial were procedurally barred because they were previously raised and resolved in his direct appeal. Doc. 11-60 at 129–31. The court found that his ineffective assistance of counsel claims should be dismissed because they did not meet the applicable legal standard. *Id.* at 131–32. Mr. Sharifi did not file a post-judgment motion. *Sharifi R.32*, 239 So. 3d at 607.

The Alabama Court of Criminal Appeals affirmed the dismissal of the Rule 32 petition. *Id.* at 613; Doc. 11-61 at 175. Like the trial court, the appellate court considered only the original petition, the May 2009 amendment, and the 2012

amendment. *Sharifi R.32*, 239 So. 3d at 607. The specific issues the appellate court considered were: (1) "trial counsel were ineffective for not raising an objection at trial to the State's use of its peremptory strikes on the ground that the strikes violated *Batson*," *id.* at 608; (2) actual innocence, *id.* at 611; (3) Mr. Sharifi "was denied his right to confront and to cross-examine his accusers when . . . the autopsy reports on the victims were admitted into evidence without the testimony of the medical examiner who had performed the autopsies," *id.* at 611–12; (4) "trial counsel were ineffective for not objecting at trial to the State's allegedly violating *Brady* . . . by failing to disclose" various evidence, *id.* at 612; and (5) Mr. Sharifi "was denied due process and access to the courts during the Rule 32 proceedings," *id.*

The appellate court noted that Mr. Sharifi did "not pursue on appeal many of the claims he raised in his petition and amendments." *Id.* at 607–08. "Those claims Sharifi raised in his petition and amendments but [did] not pursue on appeal" were "deemed abandoned" and were therefore not considered by the Court of Criminal Appeals. *Id.* at 608. Mr. Sharifi did not challenge this determination; he never argued that the appeals court erred in finding these claims abandoned or that the Rule 32 court erred when summarily dismissing these claims. Doc. 11-61 at 68–91, 139–54.

On December 9, 2016, the Alabama Court of Criminal Appeals denied rehearing, and on May 19, 2017, the Alabama Supreme Court denied certiorari. *Sharifi R.32*, 239 So. 3d at 603; Doc. 11-61 at 176–77.

### 3.  The Habeas Petition

On September 19, 2017, Mr. John Palombi and Ms. Natalie Olmstead, both Federal Defenders in the Middle District of Alabama, requested appointment as Mr. Sharifi's federal habeas counsel and requested that Mr. Sharifi proceed *in forma pauperis*. Doc. 1 at 7, 147. This court granted both motions. *Id.* at 7.

On November 15, 2017, through appointed counsel, Mr. Sharifi petitioned this court for federal habeas review pursuant to 28 U.S.C. § 2254. *Id.* In January 2018, while this habeas action was pending, the U.S. Supreme Court denied certiorari without an opinion. Doc. 11-62 at 40. This matter has been fully briefed and is ripe for adjudication. *See* Docs. 1, 15, 16, 22, 106, 115.

## II.    Legal Standards

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corrs.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Under Section 2254(a), a federal district court is prohibited from entertaining a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims of "an alleged defect in a [state] collateral proceeding" or claims related to a "state's interpretations of its own laws

or rules" are not a basis for federal habeas relief under Section 2254. *Alston v. Dep't of Corrs.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (cleaned up).

## A. Exhaustion of State Court Remedies

A habeas petitioner is required to present his federal claims to the state court and to exhaust all of the procedures available before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). "'State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)). "The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *Kelley v. Sec'y, Dep't of Corrs.*, 377 F.3d 1317, 1345 (11th Cir. 2004) (cleaned up). "[A]n issue is exhausted if the reasonable reader would understand the claim's particular legal basis and specific factual

foundation to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corrs.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (cleaned up).

## B. The Procedural Default Doctrine

If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). A "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim," so long as "the state procedural ruling rests upon adequate and independent state grounds." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (cleaned up).

The Eleventh Circuit has "established a three-part test" to use "to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

> First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Secondly, the state court's decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law. Finally, the state procedural rule must be adequate; *i.e.,* it must not be applied in an arbitrary or unprecedented fashion.

16

*Id.* (cleaned up). If all three parts of this test are satisfied, a habeas petitioner's federal constitutional claim is procedurally defaulted and cannot provide a basis for federal habeas relief.

The doctrines of procedural default and exhaustion may intertwine. For instance, if a federal petitioner's claim is unexhausted, a district court will ordinarily dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

## C. Overcoming Procedural Default – Cause & Prejudice

The "cause and prejudice" exception excuses procedural default when a petitioner can prove both "cause for the default and prejudice attributable thereto." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (cleaned up). To show cause, a petitioner must prove "that some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A non-exhaustive list of objective factors that constitute cause includes "a showing that the factual or legal basis for a claim was not reasonably available to

counsel," "some interference by officials . . . [that] made compliance impracticable," and constitutionally "ineffective assistance of counsel." *Id.*

To show prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). In the context of a defaulted claim of ineffective assistance of trial counsel, a petitioner must show not only "cause," but also "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012).

### D. The Statutory Overlay: AEDPA & Habeas Review

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (cleaned up). To grant habeas relief, this court must find not only that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2); *see also Boyd v. Allen,* 592 F.3d 1274, 1292 (11th Cir. 2010).

## E. Burden of Proof & Heightened Pleading Standards for Habeas Review

The petitioner bears the burden to establish that an issue falls within Section 2254(d)(1) or (d)(2). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). "[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (cleaned up).

On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "For purposes of [Section] 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410(2000)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional]

standard itself." *Id.* "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*

Whether a state court's application of federal law was unreasonable involves a "substantially higher threshold" than a correctness threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "Ultimately, before a federal court may grant habeas relief . . . , 'a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Guzman*, 663 F.3d at 1346 (quoting *Harrington*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

Additionally, a state court's factual determinations are presumptively correct under Section 2254(e)(1), and "the petitioner must rebut 'the presumption of correctness by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)) (cleaned up).

Finally, a habeas petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). "[T]he petition must 'specify all the grounds for relief available to the petitioner'

and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655

(2005) (quoting Rule 2(c) of the Rules Governing Section 2254 Cases in the United

States District Courts). The burden of proof is on the habeas petitioner "to establish

his right to habeas relief" by "prov[ing] all facts necessary to show a constitutional

violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008); *see also Smith*

*v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985).

### F. Claims of Ineffective Assistance of Counsel

"[T]he Constitution guarantees criminal defendants only a fair trial and a

competent attorney. It does not insure that defense counsel will recognize and raise

every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the trial

cannot be relied on as having produced a just result." *Strickland v. Washington*, 466

U.S. 668, 686 (1984). "[T]he ultimate focus of inquiry must be on the fundamental

fairness of the proceeding whose result is being challenged." *Id.* at 696.

"*Strickland* . . . provides the standard for inadequate assistance of counsel

under the Sixth Amendment." *Premo v. Moore*, 562 U.S. 115, 118 (2011). *Strickland*

states:

> A convicted defendant's claim that counsel's assistance
> was so defective as to require reversal of a conviction or
> death sentence has two components. First, the defendant
> must show that counsel's performance was deficient. . . .

> Second, the defendant must show that the deficient
> performance prejudiced the defense. . . . Unless a
> defendant makes both showings, it cannot be said that the
> conviction or death sentence resulted from a breakdown in
> the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. "Surmounting *Stickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Regarding the first part of *Strickland*, "the proper standard for attorney performance is that of reasonably effective assistance," and "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The court should consider "all the circumstances," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 688–89. This part is only satisfied when "the identified acts or omissions were outside the wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

Regarding the second part, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a

criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Explained further, the appropriate inquiry is as follows:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.* at 695. In making this evaluation, the court "must consider the totality of the evidence before the judge or jury." *Id.*

"Establishing that a state court's application of *Strickland* was unreasonable under [Section] 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. In applying the *Strickland* standard, the court must also account for the AEDPA overlay, and "[e]stablishing deficient performance under *Stickland* has this same high bar under AEDPA deference." *Mungin v. Sec'y, Fla. Dep't of Corrs.*, 89 F.4th 1308, 1317 (11th Cir. 2024). The interplay between *Strickland* and Section 2254(d) results in "double deference" on federal habeas review, which "is doubly difficult for a petitioner to overcome." *Johnson v. Sec'y, Dep't of Corrs.*, 643 F.3d 907, 911

23

(11th Cir. 2011). "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105. "When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable . . . [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### III.   Analysis of Mr. Sharifi's Claims

Most of Mr. Sharifi's claims before this court are either due process claims or ineffective assistance of counsel claims. Mr. Sharifi also attacks the constitutionality of AEDPA as well as the constitutionality of his death sentence. This court addresses the claims in the order they were presented in Mr. Sharifi's petition.

#### A. Constitutionality of AEDPA

Mr. Sharifi contends that this court should not apply 28 U.S.C. § 2254(d) to his habeas claims because the statute is unconstitutional. Doc. 1 at 13–19. Mr. Sharifi asserts that the statute is unconstitutional because it requires this court to abdicate its authority to apply the Constitution and defer to a state court's interpretation of federal law, in violation of Article III and Article VI of the United States Constitution. *See generally id.*

"A statute is presumed constitutional," and "[t]he burden is on the one attacking the legislative arrangement." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (cleaned up). Because of this presumption, "only the clearest proof [will]

suffice to establish the unconstitutionality of a statute." *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961) (cleaned up). Moreover, "[t]he presumption of validity which applies to legislation generally is fortified by acquiescence continued through the years." *Life & Cas. Ins. Co. of Tenn. v. McCray*, 291 U.S. 566, 572 (1934).

Mr. Sharifi does not cite any binding authority to support his contention that Section 2254(d) is unconstitutional. The Eleventh Circuit has not specifically addressed this issue, but other Circuits have upheld the constitutionality of Section 2254(d). *See, e.g.*, *Cobb v. Thaler*, 682 F.3d 364, 377 (5th Cir. 2012) (rejecting "argument that [Section] 2254(d)(1) is unconstitutional under Article III"); *Evans v. Thompson*, 518 F.3d 1, 4–12 (1st Cir. 2008) (rejecting claim that Section "2254(d)(1) violates Article III, the separation of powers, and the Supremacy Clause"); *Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (rejecting claim that Section 2254(d)(1) "violates the Suspension Clause and interferes with the independence of federal courts under Article III"); *Green v. French*, 143 F.3d 865, 874–75 (4th Cir. 1998) (finding that "section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy" and "only places an additional restriction upon the scope of the *habeas* remedy in certain circumstances"), *abrogated on other grounds by Williams*, 529 U.S. 362; *Lindh v. Murphy*, 96 F.3d 856, 871–74 (7th Cir. 1996)

(en banc) ("Regulating relief [under Section 2254(d)] is a far cry from limiting the interpretive power of the courts . . . and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed."), *rev'd on other grounds*, 521 U.S. 320 (1997).

This court will not hold Section 2254(d) unconstitutional absent binding precedent. Thus, Mr. Sharifi's request for *de novo* review of all claims raised under Section 2254(d)(1) is **DENIED**.

### B. Due Process Claims

Mr. Sharifi maintains that the State of Alabama deprived him of his life and liberty without due process of law, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Doc. 1 at 22.

### 1. Mr. Sharifi's right to a speedy trial

Mr. Sharifi asserts that he is entitled to habeas relief because the government deprived him of his right to a speedy trial in violation of the Sixth Amendment and Fourteenth Amendment. *Id.*

*Legal Standards*

In the light of the "unique policies" underlying the right to a speedy trial, courts "must set aside any judgment of conviction, vacate any sentence imposed, and dismiss the indictment" if the right is violated. *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010). "A state is constitutionally required to provide an

accused with a speedy trial," and "the delay that is permissible must be determined on a case-by-case basis." *Solem v. Helm*, 463 U.S. 277, 294 (1983); *see also Barker v. Wingo*, 407 U.S. 514, 522 (1972).

In *Barker*, the Supreme Court "identified some of the objective factors that courts should consider in determining whether a particular delay was excessive." *Solem*, 463 U.S. at 294–95. Courts should consider: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy trial right, and (4) actual prejudice to the defendant. *Barker*, 407 U.S. at 530. The "inquiry . . . necessitates a functional analysis of the right in the particular context of the case." *Id.* at 522. The four "factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process," and must carry out "this process . . . with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Id.* at 533

Before a speedy trial analysis is begun, a defendant must allege that "the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (cleaned up). If a defendant is able to satisfy the threshold inquiry, only then should the court consider the remaining *Barker* factors. *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006). However, if the length of the delay is sufficient to trigger the *Barker* analysis, the factor does not necessarily weigh

heavily against the government. *See Doggett*, 505 U.S. at 651–52; *Villarreal*, 613 F.3d at 1350.

"The flag all litigants seek to capture is the second factor, the reason for delay." *United States v. Loud Hawk,* 474 U.S. 302, 315 (1986). The Court has identified three different types of delay: (1) deliberate delay, (2) negligent or neutral delay, and (3) justifiable or valid delay. *Barker,* 407 U.S. at 531. The Court also assigned each type of delay a different weight for consideration by a reviewing court. *See id.* For example, "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," while "[a] more neutral reason such as negligence or overcrowded courts . . . should be considered" but "weighted less heavily," and "a valid reason, such as a missing witness, should . . . justify appropriate delay." *Id.*

*Barker*'s third factor places upon a defendant the affirmative "responsibility to assert his right." *Id.* This factor "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531–32. Should the first three factors "weigh heavily against the [g]overnment, the defendant need not show actual prejudice," *Barker*'s fourth factor. *Ingram*, 446 F.3d at 1336.

*Barker*'s fourth factor, prejudice, "should be assessed in the light of the interests . . . the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. Those interests are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize

anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* Of these protections, the last is "the most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

  *Relevant Background*

  Mr. Sharifi was arrested on December 28, 1999, and his trial began on January 25, 2005 – over five years later. *Sharifi I*, 993 So. 2d at 923–24. In the interim between his arrest and trial, Mr. Sharifi asserted his right to a speedy trial on multiple occasions. In October 2001, defense counsel objected to the trial court placing Mr. Sharifi's case on the administrative docket "when Sharifi was committed to Taylor Hardin Secure Medical Facility for further mental evaluations," arguing that transfer "makes further delay likely and violates the defendant's constitutional rights to a speedy trial." *Id.* at 924 & n.4.

  Defense counsel subsequently filed several motions requesting a speedy trial, including Mr. Sharifi's August 2003 motion to dismiss, which asserted that his speedy trial rights were violated when the government failed to comply with trial court orders to provide timely discovery. *See* Doc. 11-13 at 188. Defense counsel attached to that motion a copy of Mr. Sharifi's September 2000 handwritten request for a speedy trial – which presumably had been delivered to the trial court. *Sharifi I*, 993 So. 2d at 924. In April 2004, Mr. Sharifi's counsel requested that the trial court

29

schedule hearings on all outstanding motions because of concerns about additional delay. *See* Doc. 11-15 at 74–78.

The trial court held a hearing on Mr. Sharifi's speedy trial motions and related motions in June 2004 and then denied the speedy trial motion to dismiss and related filings. Doc. 11-3 at 33–44. In September 2004, Mr. Sharifi "renewed [his] motion to dismiss," alleging additional discovery issues. Doc. 11-28 at 124–25.

On direct appeal, Mr. Sharifi asserted that he did not receive a speedy trial, in violation of the Sixth and Fourteenth Amendments. Doc. 11-28 at 93–135. He argued that the "case was delayed at every turn by the [government] and its failure to comply with discovery, failure to comply with the trial court's [o]rders, requests for delays in court rulings, requests for continuances of motion hearings and a motion for continuance of the May 8, 2003, trial setting." *Id.* at 127. He rejected the government's assertion that "the delays were due to having to wait for autopsy evidence . . . , due to the defense's request for mental evaluations for Sharifi, [and] due to having to get an interpreter to translate for him." *Id.* He further complained that the trial court delayed ruling on motions and was slow to locate an interpreter. *Id.* at 130.

Mr. Sharifi argued that the delay was prejudicial in a number of ways. First, it "caused a rift between Sharifi and his attorneys" that "escalated as Sharifi filed bar complaints and a lawsuit against his attorneys and the legal system," thus forcing his

counsel to withdraw. *Id.* at 131. He also argued that the delay prevented cooperation between the United States and Iran, prevented his counsel from following up with alibi witnesses, exacerbated his mental health problems, and prevented his mother from being available to testify at trial. *Id.* at 132–35.

The appeals court considered each of the four *Barker* factors. *Sharifi I*, 993 So. 2d at 922 (citing *Barker*, 407 U.S. 514). Regarding the first factor – length of delay – the appeals court concluded that "the 61–month delay was presumptively prejudicial." *Id.* Regarding the second factor—reason for delay—the appeals court recited numerous factors giving rise to this delay, noting that "[b]y far the vast majority of the delays were based on the numerous and lengthy motions filed by the defense." *Id.* at 923–24. These delays therefore weighed against Mr. Sharifi. *Id.* at 924. Although the appeals court found that Mr. Sharifi asserted his right to a speedy trial (factor three), the court found that his assertions of prejudice were not supported by the record. *Id.* "The record shows that the circuit court took every precaution to ensure that Sharifi was granted a fair trial. It is clear that the majority of the delays were due to the court's desire to make every resource available to Sharifi before he faced trial on the capital charge." *Id.* The appeals court therefore held that Mr. Sharifi was not "denied his constitutional right to a speedy trial." *Id.*

*Analysis*

In his federal habeas petition, Mr. Sharifi asserts that all of the *Barker* factors weigh in his favor. Doc. 1 at 23. He argues that the appeals court erred in finding that he was primarily responsible for the delay. *Id.* at 22–50; Doc. 22 at 4. Specifically, Mr. Sharifi asserts that (1) the length of his pre-trial delay was sixty-one-months and therefore presumptively prejudicial; (2) the government's intentional withholding of discovery in violation of trial court orders is the reason for this delay; (3) he asserted his speedy trial right early and often; and (4) he suffered actual prejudice as a result of the delay. *See* Doc. 1 at 22–50.

Mr. Sharifi asserts that the appeals court decision that he was the primary reason for the delay "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* Doc. 1 at 22–50. Specifically, Mr. Sharifi claims that the appeals court's findings that (1) "[t]he vast majority of the delays were based on the numerous and lengthy motions filed by the defense" and that (2) "the majority of the delays were due to the court's desire to make every resource available to Sharifi before he faced trial on the capital charge" were based on an unreasonable determination of the facts presented. Doc. 1 at 40, 42 (quoting *Sharifi I*, 993 So. 2d at 924). Thus, Mr. Sharifi asserts that the appeals court's determination is not due deference and requests that this court review this claim *de novo*. *Id.* at 42. For the reasons given below, neither habeas relief nor *de novo* review is warranted.

The "unreasonable" requirement in Section 2254 "is difficult to meet" and does not refer "to 'ordinary error' or . . . to circumstances where the petitioner offers 'a strong case for relief,' but rather to 'extreme malfunctions in the state criminal justice system.'" *Mays v. Hines*, 592 U.S. 385, 391 (2021) (quoting *Harrington*, 562 U.S. at 102). "[A] federal court may intrude on a State's 'sovereign power to punish offenders' only when a decision 'was so lacking in justification . . . beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington*, 562 U.S. at 103) (cleaned up). To give this rule its intended effect, "a federal court must carefully consider all the reasons and evidence supporting the state court's decision" because "there is no way to hold that a decision was 'lacking in justification' without identifying—let alone rebutting—all of the justifications" in existence. *Id.* at 391– 92 (quoting *Harrington*, 562 U.S. at 103). Mr. Sharifi's arguments cannot overcome this stringent standard.

### *Delays Relating to Defense Motions*

First, Mr. Sharifi asserts that the appeals court's finding that "[t]he vast majority of the delays were based on the numerous and lengthy motions filed by the defense," *Sharifi I*, 993 So. 2d at 924, was objectively unreasonable "because the [government], not . . . Sharifi, caused the majority of the delays in this case." Doc. 22 at 4. Instead, Mr. Sharifi claims that "[t]he record reflects that the [government] delayed . . . Sharifi's trial by repeatedly failing to turn over discovery." *Id.* Mr.

Sharifi presented this argument to the appeals court. *See generally* Doc. 11-28 at 96–125.

The record shows that in August 2003, Mr. Sharifi filed a Motion to Dismiss alleging the government had violated discovery orders and his right to a speedy trial. *Id.* at 96–124. In September 2004, Mr. Sharifi renewed this motion, alleging additional discovery issues. *See id.* at 124–25. The government responded to Mr. Sharifi's initial Motion to Dismiss in September 2003, and the trial court held a hearing to discuss the motions and supplements on June 22, 2004. *See* Doc. 11-15 at 43–73; Doc. 11-3 at 32–45.

During the June 2004 speedy trial hearing, defense counsel conceded that "of course, there are delays incumbent with motions that the defense files" and that defense counsel was aware "there are arguments both ways." Doc. 11-3 at 43. The trial court subsequently denied Mr. Sharifi's motion and related supplements, finding no speedy trial violation. *Id.* at 44. The trial court stated that it was "well aware of all of the delays and kn[ew] that some could not be avoided, some could have been avoided possibly," but ultimately concluded that "this has just been a long, hard road to get this case to trial and we're finally there." *Id.* at 43–44. Based on the record and the pleadings before the appeals court, this court can infer that the appeals court agreed with the trial court's dismissal of this claim and its associated allegations. Thus, Mr. Sharifi has failed to demonstrate that no justification exists

for the appeals court's finding that "the vast majority of the delays" were caused by Mr. Sharifi's motion practice, such that there is no possibility for fairminded disagreement. *Sharifi I*, 993 So. 2d at 924.

Moreover, Mr. Sharifi has not argued that the appeals court refused to consider his argument about discovery-related delay, nor does he challenge the appeals court's findings that defense counsel filed more than 150 motions and nearly 40 *ex parte* motions in the trial court. *See* Doc. 1 at 22–50; Doc. 22 at 4–16; *see, e.g.*, Doc. 11-11 at 12–22. Further, Mr. Sharifi has not presented any evidence that his motion practice did not cause delay. *See* Doc. 1 at 22–50; Doc. 22 at 4–16. And he does not contest the appeals court's determination that his motions were "numerous" and "lengthy." *Sharifi I*, 993 So. 2d at 924; *see* Doc. 1 at 22–50; Doc. 22 at 4–16.

Notably, Mr. Sharifi's appellate brief lends support to the appeals court's finding. *See* Doc. 11-28 at 135. To demonstrate prejudice, Mr. Sharifi offered for comparison the brevity of the trial court record compared with his expansive clerk's record, which is predominately composed of Mr. Sharifi's motions filed with the trial court. *Id.* ("Unlike many capital murder cases[] the clerk's record is significantly longer than the actual trial record . . ."). A similar comparison can be made between the length of the trial record and the length of the motions filed and the time spent resolving these motions. *Compare* Doc. 11-1 at 1-10 *with* Doc. 11-11 at 1-11.

*Delays Relating to Competency Challenges*

The appeals court considered the delay resulting from defense counsel's multiple motions challenging Mr. Sharifi's competency to stand trial and his mental health at the time of the offense, as well as defense counsel's related motions and requests, and concluded that the record showed Mr. Sharifi was malingering to cause delay. *See Sharifi I*, 993 So. 2d at 924. Although Mr. Sharifi argues that his competency evaluation was responsible only for forty-six days of delay, Doc. 1 at 40–41; Doc. 22 at 5, the record establishes that competency-related disputes initiated by Mr. Sharifi delayed the case for years.

Mr. Sharifi pleaded both not guilty and not guilty by reason of mental disease or defect. Doc. 11-13 at 81. On April 13, 2001, defense counsel moved for an evaluation of Mr. Sharifi's competency, and later moved for funding for expert testing by psychologists and psychiatrists and a jury determination of Mr. Sharifi's mental status. Doc. 11-11 at 54–55, 147–52; Doc. 11-13 at 19–20. The trial court ordered that Mr. Sharifi's competency to stand trial be evaluated as requested by defense counsel. Doc. 11-11 at 51–53.

In October 2001, Dr. Melissa Clinger performed outpatient evaluations of Mr. Sharifi's competency and reported her findings. Doc. 11-13 at 44–48. Dr. Clinger reported that Mr. Sharifi was non-cooperative as "discussion regarding courtroom procedures or personnel [were] not conducted, given [Mr. Sharifi's] repeated

statements he did not understand words or English well enough to proceed and his tendency to steer the discussion to his religious convictions." *Id*. at 47. Dr. Clinger also reported that Mr. Sharifi's defense counsel "later indicated that [Mr. Sharifi] often refuses to discuss the facts of the case and noted that his demeanor has varied across different visits and consultations." *Id.*

Dr. Clinger also expressed that "[t]he possibility of the exaggeration of symptoms or malingering [was] another factor," but was unable to discern if his self-reported symptoms were attributable to a psychological condition or if Mr. Sharifi was "fabricating symptoms entirely." *Id.* Because Dr. Clinger was unable to definitively evaluate whether Mr. Sharifi was malingering or experiencing genuine mental illness, she recommended that the trial court send him to Taylor-Hardin Secure Medical Facility for extensive evaluation and treatment. *Id.* at 48. The trial court, at defense counsel's request, ordered that Mr. Sharifi be transferred to Taylor Hardin and placed his case on its administrative docket "to avoid further delay." *See Id.* at 55–57, 74–77.

On December 3, 2001, Mr. Sharifi was admitted to Taylor Hardin for the court-ordered evaluations. *Id.* at 61; *see also* Doc. 1 at 43. Mr. Sharifi was discharged on January 18, 2002. Doc. 11-15 at 61. On January 24, 2002, the trial court filed Dr. Kamal Nagi's report regarding Mr. Sharifi's competency and mental health at the time of the offenses. Doc. 11-13 at 61–71. Dr. Nagi found that Mr. Sharifi was

competent and able to assist in his own defense "if he so desire[d]" and that Mr. Sharifi was not suffering from any mental disorder or disease at the time of the murders that would have affected his moral culpability. *Id.* at 67, 70.

Dr. Nagi also diagnosed Mr. Sharifi with "Axis I: Malingering." *Id.* at 67. Dr. Nagi supported this diagnosis with test results that revealed inconsistencies in Mr. Sharifi's performance and education level. *Id.* at 65. Further, Dr. Nagi recognized multiple inconsistencies between Mr. Sharifi's self-reported memory loss and inability to understand America's jurisprudence system and Dr. Nagi's observations of Mr. Sharifi's ability to remember details pertaining to his case and relay specific legal strategies he was employing to avoid prosecution. *Id.* at 66–67.

In support, Dr. Nagi quoted from his conversation with Mr. Sharifi during which Mr. Sharifi revealed that it was his strategy to be sent for multiple competency evaluations based on feigned mental illness to avoid trial and admitted that, were trial to continue, he would make outbursts to disrupt the proceedings for the purpose of being sent for additional competency evaluations. *Id.* at 68–69. Specifically, Mr. Sharifi stated:

> After two or three times [the government] will have to keep me in a mental hospital and upon the recommendation of my attorney . . . my parents contacted my lawyers from the embassy and they told me that my lawyers are trying to help me and that the more time[s] [the government] find[s] me not competent the more it helps me. . . . **My strategy is to be found incompetent**.

*Id.* at 68 (emphasis added).

Mr. Sharifi also stated that he had learned from another inmate that when that inmate "caused a disturbance . . . the judge ordered a mental evaluation," so Mr. Sharifi said, "I will cause trouble," and cautioned that his lawyers "better keep me in a mental hospital" and that if his trial were to continue, "I will stand and hit my lawyer and scream at the judge. I will grab a chair and cause problems." *Id.*

The record lends additional support to Dr. Nagi's determination that it was Mr. Sharifi's intention to disrupt courtroom proceedings to obtain another competency evaluation and avoid trial. *See id.* at 68, 70. For example, at the first hearing with Mr. Sharifi present on April 11, 2002, Mr. Sharifi interrupted counsel multiple times with declarations including statements such as: "I do believe anything is a conspiracy against me, Your Honor. That's conspiracy against me. . . . All of that is[;] . . . I don't trust my lawyer[;] . . . Your Honor I feel I am a gorilla. I am an animal. I need bananas." Doc. 11-1 at 33–34. Mr. Sharifi interjected again at the end of that hearing saying, "I don't need lawyer." *Id.* at 96.

During Mr. Sharifi's motion hearing on his request for an interpreter in August 2002, he again interrupted proceedings to say: "Your Honor, you charge me for stealing bananas. I didn't steal bananas," *id.* at 136; "I don't know why I'm here," *id.* at 175; and "Your Honor, I hear voices I don't understand," *id.* at 182.

After receiving Dr. Nagi's report, Mr. Sharifi's counsel moved for a jury determination of Mr. Sharifi's mental state for the second time. Doc. 11-13 at 81–82. In July 2002, the trial court granted defense counsel's request for expert funding for a mental evaluation and ordered Mr. Sharifi be made available for the expert, Dr. Marianne Rosenzweig, at her request. *See id.* at 109–11. On August 29, 2002, Dr. Rosenzweig evaluated both Mr. Sharifi's mental health and competency. Doc. 11-18 at 1.

On September 12, 2002, Dr. Rosenzweig reported the results of these evaluations to defense counsel. *Id.* During her clinical interview with Mr. Sharifi, Dr. Rosenzweig reported that his examples of the "self-reported symptom of memory loss" were contradictory, "illogical," and inconsistent with his observed abilities – "most notably that he demonstrated excellent recall for certain facts." *Id.* Further, Dr. Rosenzweig observed that Mr. Sharifi was able to "relate[] a detailed account of having filed a [pro se] motion with the judge in his case [five]-[six] months ago," and when asked about the motion, he gave "an accurate explanation, demonstrating not only a good command of English but an understanding of legal concepts beyond the knowledge of the average citizen." *Id.*

In addition to Mr. Sharifi's self-reported auditory and visual hallucinations of "dead soldiers" and "his dead wife" along with other "flashbacks" from war, Dr. Rosenzweig reported that Mr. Sharifi "repeatedly" stated he believed he was "a

gorilla, and that his current criminal charge is stealing a banana" and that throughout her administration of the MacCAT-CA test, Mr. Sharifi "removed his 'flip flop' shoe, and gnawed on it." *Id.* at 2. Dr. Rosenzweig explained that these "self-reported symptoms do not usually occur in the[se] combinations . . . in bona fide cases of mental illness." *Id.* Further, Dr. Rosenzweig determined that Mr. Sharifi did not "demonstrate the gross incapacities in mental functioning that would be expected" if he was "genuinely experiencing these symptoms" and instead "found him to be lucid, coherent, [with well-organized] . . . thought processes." *Id.*

Like Dr. Nagi, Dr. Rosenzweig also tested Mr. Sharifi's mathematical abilities and English comprehension, though she reported that she "experienced no difficulty communicating in English with Mr. Sharifi." *Id.* Dr. Rosenzweig found that Mr. Sharifi's performance supported Dr. Nagi's findings that Mr. Sharifi "was deliberately not answering questions correctly, as Dr. Nag[i] believed to be the case." *Id.* Dr. Rosenzweig reported that when testing Mr. Sharifi's competency, he "scored a zero on every question on the test." *Id.* Thus, Dr. Rosenzweig concluded that Mr. Sharifi was "deliberately feigning incompetence" because he "was not" "floridly psychotic and unable to respond to questions with any understanding." *Id.* Dr. Rosenzweig's interviews with jail guards and the jail's psychiatric nurse about Mr. Sharifi's observed behavior also indicated inconsistencies with a finding of incompetency or Mr. Sharifi's self-reported mental illness. *See generally id.* at 2–3.

41

Based on all of this information, Dr. Rozenzweig concluded that Mr. Sharifi was "attempting to feign mental illness." *Id.* at 3. Dr. Rosenzweig recognized that there was "documented proof that [Mr. Sharifi] was treated for a serious mental illness in Iran long before he was charged in this case" but ultimately expressed that, even if Mr. Sharifi did have a "genuine mental illness . . . it was not possible . . . to detect it underneath the multitude of malingered symptoms he presented." *Id.* at 3– 4.

Notably, with only two weeks until Mr. Sharifi's initial trial date of May 5, 2003, defense counsel had not provided the government Dr. Rosenzweig's September 2002 report on Mr. Sharifi's mental health and competency. *See* Doc. 11-2 at 14. Instead, on April 16, 2003, in response to the government's request for this report, defense counsel stated that Mr. Sharifi's mental health evaluations were "still in the works" and that "no report [had been produced] yet" because they were "still working on it." *Id.*

Two days later, when asked about the status of Dr. Rosenzweig's report, defense counsel—after having waived Mr. Sharifi's presence—indicated for the first time that they would not be challenging Mr. Sharifi's competency "at this point," nor would they continue to pursue a mental-health-based defense. *Id.* at 20, 59–60. Mr. Sharifi's challenges to his competency and his mental health defense were officially waived and withdrawn in June 2004, when both Mr. Sharifi and defense

counsel stated on the record that they would not be pursuing either. *Id.* at 98–101. Even so, in September 2004—the week trial was set to begin—defense counsel moved for another court-ordered competency evaluation of Mr. Sharifi. Doc. 11-4 at 38; Doc. 11-17 at 170–74. The government objected to that request to prevent further delay and because the record indicated that Mr. Sharifi had been using allegations of mental illness and competency challenges to evade trial. Doc. 11-17 at 178–79; *see also* Doc. 11-4 at 39–42.

The record therefore supports the conclusion that questions concerning Mr. Sharifi's mental health and competency contributed to delays from April 2001 until at least June 2004—and possibly a few months longer. The appeals court's consideration and weighing of these events as reasons for delaying Mr. Sharifi's trial was not "an unreasonable application of[] clearly established Federal law," nor was it "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

*Delays Relating to Discovery*

Mr. Sharifi claims that "[a]lmost every delay in the case was a result of the State's refusal to disclose discovery," and the government's withholding of discovery information delayed the case for years. Doc. 1 at 40–41. He relies on several discovery motions to argue that the government intentionally withheld

discovery from the defense in violation of court orders. *See* Doc. 1 at 24–28; Doc. 22 at 4–6.

In March 2000, Mr. Sharifi's initial defense counsel filed a general discovery motion and a motion to preserve evidence in the trial court. Doc. 1 at 24. In April 2001, defense counsel requested the release of Mr. Sharifi's personal belongings— namely, a briefcase and its contents that were seized at the time of Mr. Sharifi's arrest in Los Angeles. Doc. 11-1 at 26; Doc. 11-11 at 12. On April 20, 2001, the trial court granted Mr. Sharifi's request to release all personal belongings that were not evidence. Doc. 11-11 at 13.

Before the trial court granted Mr. Sharifi's motion requesting the release of personal property, Mr. Sharifi had pleaded not guilty by reason of mental disease or defect, and on April 13, 2001, defense counsel moved to challenge Mr. Sharifi's competency to stand trial. *See id.* at 12–13. Defense counsel sent letters seeking discovery on April 26, 2001 and June 27, 2001. *See* Doc. 11-14 at 20–21. In the June 27, 2001 letter, Mr. Sharifi's counsel acknowledged that they had not been focusing on Mr. Sharifi's case because they were preoccupied with another client's case that was now resolved. *Id.* at 21. Defense counsel also asked that the government to release the briefcase and its contents. *Id.* at 20–21.

On July 25, 2001, defense counsel filed a motion to compel discovery. *See* Doc. 11-1 at 26. On August 7, 2001, the government provided defense counsel with

some—but not all—of the requested discovery. *See* Doc. 11-13 at 34. Defense counsel again wrote the government on August 22, 2001, noting that six of twelve pages had not been copied and one fax sheet was not included in the initial file, and defense counsel "need[ed] to make arrangements to have access to the physical evidence." Doc. 11-14 at 26. Nothing in the record indicates that these missing items were not provided by the government in a timely manner.

In October 2001, the government moved for a continuance of Mr. Sharifi's interpreter hearing because of the outstanding competency issue and the absence of the government's lead investigator, and defense counsel objected. Doc. 11-13 at 38–41. In this objection, defense counsel argued that the motion hearing should be held as scheduled because there were outstanding motions that did not require testimony, including the disputed discovery motion to release Mr. Sharifi's briefcase and its contents, which the government had not provided to defense counsel because of its potential evidentiary value. *See id*.

Over defense counsel's objection, the case was then moved to the administrative docket while Mr. Sharifi was "committed to Taylor Hardin Secure Medical Facility for further mental evaluations." *Sharifi I*, 993 So. 2d at 924 & n.4. The trial court held a hearing on March 21, 2002. Doc. 11-1 at 23–32. Because Mr. Sharifi was not present, the trial court continued the interpreter hearing and generally reviewed the motions before the court. *Id.* Defense counsel again raised the issue of

the briefcase and its contents, claiming that the government had discoverable evidence that was critical to the development of Mr. Sharifi's defense. *Id.* at 26.

The government responded that the requested property was potential evidence because of Mr. Sharifi's mental health defense and his ongoing competency challenge. *Id.* at 28–29. The government explained that the requested property could be used to show Mr. Sharifi's mental state prior to, during the timeframe of, and after the murders. *See id.* The government also stated that release of this briefcase and contents would result in chain of custody problems and stated that this briefcase and its contents were available for the defense counsel to inspect, view, and copy. *Id*. at 27–32; *see, e.g.*, Doc. 11-15 at 44. Further, the government told the defense that it would be available to meet defense counsel to view and inspect the physical evidence anytime during the following week. Doc. 11-1 at 30–32. Defense counsel agreed to that arrangement. *Id.* at 32.

Defense counsel did not respond to the government's attempts to schedule a viewing of this physical evidence during the week after the hearing. Doc. 11-1 at 46. Instead, defense counsel asked to view the evidence the following week, when the government was unavailable. *Id.* At the next hearing, on April 11, 2002, defense counsel again complained that they had not been given access to the briefcase or its contents and requested copies of everything. *Id.* at 42–43, 47–49. The government responded that defense counsel's cooperation was also required. *Id.* at 46. The

government also explained the difficulty presented in fulfilling defense counsel's demands because to do so would require copying notebooks, address books, business cards and the like, and indicated that they were unsure of the resources available to Investigator Lisa Hamilton. *Id.* at 49–50, 58–59.

Based on defense counsel's request for copies of the contents of Mr. Sharifi's briefcase and their asserted importance, defense counsel moved for the trial court to impose a deadline for their production. *See id.* at 45–46, 48–49. The government requested that the court refrain from setting any "arbitrary deadlines" but added that it understood the need to handle these matters expeditiously. *Id.* at 46–47. Defense counsel continued representing that their proposed "deadline" was not a firm deadline but, instead, a "target date to work with," *id.* at 49, and the trial court agreed, *id.* at 51–52. Mr. Sharifi now claims that the government violated the trial court's order by producing these copies for the defense sixteen days beyond its sixty-day deadline. *See* Doc. 1 at 28; Doc. 11-1 at 51–52.

Mr. Sharifi identifies additional discovery delays by the government, including delays in turning over crime scene photos, the affidavit supporting the search warrant for Mr. Sharifi's apartment, and a page from a police report. Doc. 1 at 44. He alleges that these delays should "weigh heavily against the State." *Id.* at 45.

*Delays Resulting from Defense Counsel's Withdrawal*

The record also reflects that by January 2004, Mr. Sharifi had filed a complaint against his defense counsel with the Alabama Bar Association. Doc. 11-15 at 113. Because of Mr. Sharifi's Bar complaint, his defense counsel filed the first of three motions to withdraw on January 14, 2004. *See id.* at 113–14. In the first motion to withdraw, defense counsel advised the court that appointment of new counsel would be in Mr. Sharifi's "best interest" and "would not adversely affect" his case "[b]ecause no trial date [had been] set." *Id.*at 114. On March 2, 2004, defense counsel filed its third motion to withdraw and proposed that because "no trial date is set [the] trial could be scheduled in such a way as to provide new counsel adequate time to prepare for trial." Doc. 11-15 at 177. The trial court subsequently granted defense counsel's request to withdraw and appointed new counsel. *See Sharifi I*, 993 So. 2d at 923.

Mr. Sharifi contends that he is not to blame for any delay resulting from his counsel's withdrawal, because by the time counsel moved to withdraw, the court had already indicated that trial could not occur until the Fall of 2004. *See* Doc. 1 at 37; Doc. 22 at 10 (citing Doc. 11-15 at 176).

After his counsel withdrew, Mr. Sharifi filed a federal lawsuit against them, also naming the government and prosecuting attorneys, law enforcement, and the trial judge as defendants. *See* Doc. 11-28 at 247 n.3 (citing *Sharifi v. Dorning, et. al.,* United States District Court for the Northern District of Alabama, Case No. 5:04-

cv-00591-CLS-JEO). This federal lawsuit prevented Mr. Sharifi's newly appointed trial counsel from obtaining his prior counsel's files while the federal litigation was ongoing. *See* Doc. 11-3 at 47–51.

At the time of their withdrawal, Mr. Sharifi's prior counsel represented that they would "gladly give new counsel complete access to [their] entire file on the defendant and will make themselves available for consultation with new counsel as to expedite preparations for trial and to avoid any further delay in the trial of this case." Doc. 11-15 at 114. But because of the federal litigation, Mr. Sharifi's newly appointed trial counsel were required to copy all of the files, delaying their ability to develop the defense. *See* Doc. 11-28 at 247.

### *Additional Factors Contributing to Delays*

On September 13, 2004, the week Mr. Sharifi's trial was set to begin, defense counsel moved for a continuance because Mr. Sharifi's mother was not in the United States. Doc. 11-3 at 87–88. Defense counsel had previously reported in June 2004 that Mr. Sharifi's mother was no longer in the United States and that counsel "hope[d]" she would return by trial. *See* Doc. 11-2 at 189. Defense counsel also said that they were "sure [she] can testify," but made no further comments about her importance to the defense. *Id.*

In their September 2004 motion, defense counsel asserted that Mr. Sharifi's mother's testimony was "essential" and "critical in the defense." Doc. 11-3 at 87.

Defense counsel represented that it had diligently tried to facilitate Mr. Sharifi's mother's return to the United States for several months but had been unsuccessful because she left the country because of a "personal situation" after having overstayed her United States visa. *Id.* at 88. When asked by the court what testimony Mr. Sharifi's mother would offer, defense counsel declined to say. *Id.* at 89–90. The trial court granted defense counsel's requested continuance without this requested proffer—and despite the fact that Mr. Sharifi's mother's reentry in time for trial was not probable. *See id.* at 88–90. Defense counsel then waited months to move to depose Mr. Sharifi's mother at the Turkish Embassy in Iran. *See* Doc. 11-19 at 23–24, 29–32. Defense counsel filed this motion in January 2005, just weeks before Mr. Sharifi's trial date. *Id.* at 29–32. The government objected to motion. *Id.* at 25–26.

The records presented to the appeals court support the inference that Mr. Sharifi's actions contributed to delays in his trial setting. Mr. Sharifi filed 123 motions through counsel, as well as over thirty *ex parte* motions. *See Sharifi I*, 993 So. 2d at 924 n.3. Mr. Sharifi has not demonstrated that it is beyond all possibility for fairminded disagreement that responsibility for the delays rests with the government. He has not shown that the appeals court decision weighing the third *Barker* factor against Mr. Sharifi after finding him responsible for the "vast majority of the delays" was an unreasonable application of law or an unreasonable determination of facts. *Id.* at 924.

When considering the fourth *Barker* factor of prejudice, the state appeals court determined that Mr. Sharifi was not prejudiced by the delay in bringing the case to trial, because the trial court wanted "to make every resource available to Sharifi before he faced trial on the capital charge." *Id.* "The record shows that the circuit court took every precaution to ensure that Sharifi was granted a fair trial." *Id.* Mr. Sharifi argues that this conclusion is "unreasonable and unsupported by the record." Doc. 22 at 11. However, based on the various record evidence discussed above, this court cannot say that the state court applied the law or viewed the facts unreasonably with respect to the prejudice factor.

For all of these reasons, Mr. Sharifi has failed to show that the state proceedings adjudicating his speedy trial claim involved "an unreasonable application of[] clearly established Federal law" or were "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Although the length of the delay was presumptively unreasonable and Mr. Sharifi asserted his right to a speedy trial, his responsibility for the delay weighs against him, and the finding that he was not prejudiced by the delay was not unreasonable. Accordingly, Mr. Sharifi is not entitled to habeas relief on this claim.

## 2. Mr. Sharifi's absence from various court proceedings

Mr. Sharifi asserts that habeas relief is due because he was neither physically nor constructively present "during every stage of the proceeding against him in

violation of his rights under the Sixth and Fourteenth Amendments." Doc. 1 at 50 (cleaned up). The Respondent argues that "[t]his claim is procedurally defaulted from this court's review because Sharifi failed to fairly present it to the state courts." Doc. 15 at 11. Mr. Sharifi replies that he "gave the Alabama courts a fair opportunity to review and decide this claim" because he raised it "[i]n his first supplement" to his Rule 32 petition, "which the [Rule 32] court" recognized. Doc. 22 at 26. Mr. Sharifi contends that because the claim was "presented to the state court but not decided," he could not raise the claim on direct appeal, and thus the claim is not procedurally defaulted. *Id.* at 28.

Mr. Sharifi concedes that when he raised this claim in the Rule 32 proceeding, he raised it as an ineffective assistance of counsel claim and not as a due process claim. *Id.* at 27. He argues that this court should nonetheless consider the claim as raised because of the liberal construction afforded *pro se* pleadings. *Id.* Mr. Sharifi further asserts that because the Rule 32 court did not rule on the merits of the claim, it is "not subject to the deferential standard that applies under AEDPA." *Id.* (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)).

Mr. Sharifi must have clearly and definitively presented his claim to the state court to have sufficiently exhausted the claim; in order words, he "must have presented the state court with this particular legal basis for relief in addition to the facts supporting it." *Kelley*, 377 F.3d at 1350. Mr. Sharifi did not fairly present the

due process claim he now raises to the state's highest court, either on direct appeal or on collateral review. Accordingly, that claim is procedurally defaulted. *See Castille*, 489 U.S. at 351; *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002). Furthermore, Mr. Sharifi was represented by counsel for almost the entirety of his Rule 32 proceedings, and the petitions prepared by counsel—including the petition filed by counsel after Mr. Sharifi's first *pro se* supplement—did not include this due process claim. Mr. Sharifi has not met the exhaustion requirement of Section 2254(b)(1) and is procedurally barred from raising this claim in his federal habeas petition. *See Pope v. Rich*, 358 F.3d 852, 853 (11th Cir. 2004).

### 3. Mr. Sharifi's presentation of mitigation evidence

Mr. Sharifi claims that his "rights under the Eighth and Fourteenth Amendments were violated because he was precluded from discovering and presenting mitigation evidence." Doc. 1 at 64 (cleaned up). More specifically, he argues that the trial court violated his due process rights "because counsel was precluded from discovering and presenting evidence of Mr. Sharifi's character, background, and propensity during the sentencing phase of his trial." *Id.* He claims that because his representatives were unable to travel to Iran, they were unable to obtain key mitigation evidence, and Mr. Sharifi should therefore not have been eligible for a death sentence. *Id.* at 65–66.

Mr. Sharifi's argument on this issue rests on Iran's refusal to issue a travel visa to his mitigation expert. *See id.* He asserts that Iran refused to issue the visa because of the lack of diplomatic relations between Iran and the United States, and his mitigation expert needed the travel visa to travel to and conduct a mitigation investigation within Iran. *See id.* Because his expert was unable to enter Iran, Mr. Sharifi claims his defense was unable to develop mitigation leads and potentially obtain beneficial mitigation evidence. *See id.* As a result, Mr. Sharifi asserts that he was unable to present a complete mitigation defense, which effectively "precluded" his sentencer's consideration of Mr. Sharifi's character and background. *Id.*

Mr. Sharifi moved the trial court to prohibit consideration and imposition of the death penalty because of his inability to conduct the Iranian mitigation investigation. Doc. 11-28 at 155. The trial court denied this request, and Mr. Sharifi argues that his death sentence is therefore unconstitutional under various Supreme Court decisions, including *Furman v. Georgia*, 408 U.S. 238 (1972), *Woodson v. North Carolina*, 428 U.S. 280, 304–05 (1976), *Lockett v. Ohio,* 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Gregg v. Georgia*, 428 U.S. 153 (1976), and related precedents. Doc. 1 at 65–71.

*Relevant Background*

Mr. Sharifi raised this argument on direct appeal, where the court found that "nothing in the record indicates that Sharifi was prevented from presenting any

available mitigation evidence," and he was "due no relief on this claim." *Sharifi I*, 993 So. 2d at 942. The court reasoned that Mr. "Sharifi was allowed every available resource" to obtain various types of mitigation evidence. *Id.* at 941. The court noted that "the record tends to support the conclusion that counsel made a strategic decision to not present some mitigation evidence at the sentencing hearing before the jury." *Id.* at 942.

The appeals court recognized that the trial court provided Mr. Sharifi opportunities to develop and obtain mitigation evidence in his defense. *See id.* For example, the appeals court found that the trial court ordered that Mr. Sharifi receive a mental-health examination conducted by a professional and that, based on those findings, the trial court ordered that Mr. Sharifi receive additional, comprehensive, mental-health evaluations. *Id.* at 941. The appeals court also found that the trial court granted Mr. Sharifi's requests for professional assistance, providing him with both an interpreter and a mitigation expert. *Id.*

The appeals court found that the trial court ensured Mr. Sharifi had the necessary financial support to pursue his defense. *See id.* For example, the appeals court cited the trial court's approval of multiple defense motions that provided up to $64,500 in additional funding for Mr. Sharifi's defense. *Id.* The appeals court found this approved sum allocated $14,500 to pay Mr. Sharifi's mitigation expert and

defense counsel's investigation and deposition expenses and $50,000 to cover anticipated travel expenses to Iran for Mr. Sharifi's mitigation expert. *Id.*

The appeals court determined that "Sharifi was allowed every available resource" to locate or otherwise obtain mitigation evidence. *Id.* The appeals court also found that even though "Sharifi's investigator was unable to travel to Iran" to develop mitigation evidence because the United States and Iran do not have diplomatic relations, Mr. Sharifi had access to mitigation evidence available at the time of trial and during sentencing that included his father's testimony. *See id.* at 941–42.

Additionally, the appeals court inferred from the record that, as a matter of trial strategy, Mr. Sharifi's counsel withheld some mitigation evidence from the penalty-phase jury. *Id.* at 942. The appeals court observed that during the penalty phase, Mr. Sharifi presented only one witness: his expert. *Id.* Mr. Sharifi's expert testified that "he was unable to obtain [meaningful] mitigating evidence because he was unable to secure a travel visa to Iran." *Id.* During closing arguments, defense counsel argued before the jury that it would be fundamentally unfair to sentence Mr. Sharifi to death because, despite defense counsel's best efforts, the defense had failed to conduct a mitigation investigation in Iran. *Id.* The appeals court inferred from this testimony and other testimony in the record that Mr. Sharifi's counsel had made a strategic decision to limit the introduction of other available mitigating

evidence to the sentencing jury. *See id.* The appeals court also noted that this "fairness" theme continued into the sentencing hearing through Mr. Sharifi's statements, his father's testimony to the trial court, and defense counsel's final arguments before Mr. Sharifi was sentenced to death. *Id.* The appeals court ultimately denied Mr. Sharifi's claim because there was "nothing in the record [that] indicate[d] that Sharifi was prevented from presenting any available mitigation evidence." *Id.*

*Analysis*

Mr. Sharifi is not entitled to habeas relief on this claim because he cannot show that the appeals court decision contradicts "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

> A state-court decision is contrary to . . . clearly established precedents if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result.

*Brown*, 544 U.S. at 141. When Supreme Court precedent "give[s] no clear answer to the question presented, let alone one in [the defendant's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law," and habeas relief is not authorized under 28 U.S.C. § 2254(d)(1). *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (cleaned up).

This court first discusses each of the Supreme Court cases that Mr. Sharifi discusses. In *Eddings*, the Supreme Court vacated a state death sentence after finding that a trial judge violated the Eighth and Fourteenth Amendments by refusing to consider mitigating factors other than a defendant's youth. 455 U.S. at 114–17. The trial judge expressly refused to consider evidence of the defendant's "unhappy upbringing and emotional disturbance." *Id.* at 109. The Supreme Court held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence . . . proffered on [a defendant's] behalf." *Id.* at 113–14.

*Furman*, *Gregg*, *Woodson*, and *Lockett* address whether various state capital punishment statutes violate the Eighth and Fourteenth Amendment. In *Furman*, the Court held imposition of the death penalty under certain Georgia and Texas statutes unconstitutional as cruel and unusual punishment. 408 U.S. at 239–40. The *Furman* decision does not discuss the issue of mitigating evidence and sentencing.

In *Gregg*, the Court upheld Georgia's post-*Furman* amended capital sentencing statute as constitutional and articulated a standard for the constitutionality of a state's statutory sentencing procedure. 428 U.S. at 197–99, 203. In upholding the revised statute as constitutional, the Court noted that "the jury is authorized to consider any other appropriate aggravating or mitigating circumstances." *Id.* at 197.

The Court further noted that the scope of the mitigating circumstances was not defined by statute. *Id.* at 164.

In *Woodson*, the Supreme Court held that a state statute that automatically sentences a defendant convicted of "a broad category of homicidal offenses" to death "violate[s] the Eighth and Fourteenth Amendments." 428 U.S. at 287, 302. *Woodson* rejects a "mandatory death penalty statute" and endorses "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Id.* at 303.

In *Lockett*, the Court found an Ohio statute unconstitutional because it restricted the type of mitigating circumstances a sentencing judge could consider in a capital case and did "not permit the type of individualized consideration of mitigating factors" required under "the Eighth and Fourteenth Amendments." 438 U.S. at 606–07. The Court held that in almost all capital cases, the "Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis omitted).

The appeals court ruling on Mr. Sharifi's direct appeal does not contradict any of these decisions—or any other binding precedent. *See* 28 U.S.C. § 2254(d)(1). Unlike *Eddings*, Mr. Sharifi does not assert that the trial judge or the penalty-phase

jury here refused to consider any mitigating factor his counsel proffered. *See* 455 U.S. at 117. Indeed, the record reflects that Mr. Sharifi's trial judge concluded that death was the appropriate sentence after considering both statutory and non-statutory mitigating factors. Doc. 11-20 at 20–23.

*Furman*, *Gregg*, *Woodson*, and *Lockett* are not on point. None of these cases hold that the death penalty should be unavailable for consideration or imposition when, due to events beyond the control of either party, a defendant is prevented from acquiring potentially beneficial mitigating evidence. Because there is no Supreme Court precedent clearly establishing that Mr. Sharifi had a right to this type of mitigation evidence, he is not entitled to habeas relief on this claim under 28 U.S.C. § 2254(d)(1). *See Wright*, 552 U.S. at 126.

### 4. Admission of Ms. Smith-Sharifi's autopsy report

Mr. Sharifi claims that "[t]he trial court's admission of Ms. Smith-Sharifi's autopsy report violated Mr. Sharifi's due process rights and rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution." Doc. 1. at 72 (cleaned up). Specifically, he argues that "[t]he State of Alabama violated Mr. Sharifi's rights under the Sixth and Fourteenth Amendments of the United States Constitution because it deprived him of his right to confront Dr. Johnny Glenn, a key witness against him." *Id.* Dr. Glenn performed the autopsy on Sarah Smith-Sharifi. *Id.* Mr. Sharifi argues that Dr. Glenn's report was testimonial

in nature, and the trial court erred by admitting the report as a business record without giving Mr. Sharifi an opportunity to cross-examine Dr. Glenn. *Id.* at 72–75, 78.

*Relevant Background*

Dr. Glenn, a forensic pathologist previously employed by Alabama's Department of Forensic Science, performed Mrs. Smith-Sharifi's autopsy with the assistance of Mr. Gerald Howard, a forensic pathology technician. Doc. 11-19 at 58. In the autopsy report, Dr. Glenn documented three gunshot wounds to Mrs. Smith-Sharifi's head: two entrance wounds and one exit wound. Doc. 11-20 at 152–53.

Mr. Sharifi claims that less than a month before trial, the state filed a notice that it planned to offer Dr. Glenn's autopsy report as evidence as a business record. Doc. 1 at 73; Doc. 11-19 at 58. In this notice, the state disclosed that, per information received from Dr. Glenn's treating physician, Dr. Glenn would be unavailable to testify at trial due to his "psychological state." Doc. 1 at 73. Defense counsel moved to exclude the autopsy report, arguing that its admission would violate the Confrontation Clause. *Id.* The trial court determined that the report was admissible as a business record and that its admission did not violate the Confrontation Clause. *Id.*

Mr. Howard testified at trial about the observations he made while assisting Dr. Glenn during the autopsy. Doc. 11-7 at 133–38. Mr. Howard testified that he

took photos of Mrs. Smith-Sharifi's body and her wounds during her autopsy. *Id.* at 136, 167; *Sharifi I*, 993 So. 2d at 932. These photographs were introduced and published to the jury. Doc. 11-7 at 146–49, 150–51, 153–54, 167. Additionally, Mr. Howard testified that he discovered, collected, and photographed the copper bullet removed from the left side of Mrs. Smith-Sharifi's head. *Id.* at 167–68. In doing so, Mr. Howard explained that he assisted in preserving, packing, and sealing the recovered bullet and witnessed Dr. Glenn write his initials on the recovered bullet's evidence bag. *Id.*; *Sharifi I*, 993 So. 2d at 932.

Dr. Adam Craig, a medical examiner employed by the Department of Forensic Sciences, also testified as an expert witness. Doc. 11-7 at 192–93. Dr. Craig testified that he was not present for Mrs. Smith-Sharifi's autopsy and did not contribute to Dr. Glenn's report. *See* Doc. 1 at 73–74; Doc. 11-7 at 192–96. Dr. Craig testified that, as a matter of regular business practice, a medical examiner employed by the Department of Forensic Sciences would prepare and submit a report after conducting an autopsy. *See* Doc. 11-7 at 192–97. The trial court then admitted Dr. Glenn's autopsy report into evidence under the state's business-record exception to the hearsay rule. *Id.* at 197.

After testifying that he found the autopsy photographs and report to be "consistent," Dr. Craig testified about the path the bullets took through Mrs. Smith-Sharifi's head. *Id.* at 202; Doc. 11-8 at 3. Ultimately, Dr. Craig testified that, after

considering all evidence from Mrs. Smith-Sharifi's autopsy and based on his own expertise, he was able to conclude within "a reasonable degree of medical certainty" that her death was caused by "[m]ultiple gun shot wounds of the head." Doc. 11-8 at 4–5. Dr. Craig affirmed this conclusion on cross-examination, opining that one bullet's trajectory through Mrs. Smith-Sharifi's head resulted in "definite" death. *Id.* at 21.

The coroner who performed the autopsy on Mr. Brown did testify at trial. *Sharifi I*, 993 So. 2d at 932. He "testified that Brown died as a result of a gunshot wound to his head." *Id.*

Mr. Sharifi preserved his objections to the admissibility of Dr. Glenn's autopsy report throughout trial and raised this issue on direct appeal, arguing "that the admission of the report violated his right to confrontation and the United States Supreme Court's decision in *Crawford v. Washington*." *Sharifi I*, 993 So. 2d at 928. After extensive consideration of both United States Supreme Court and Alabama precedent, the appeals court determined that "an autopsy report is a business record and nontestimonial in nature and that its admission does not" violate the Confrontation Clause. *Id.* at 931.

The appeals court found no error because "Sharifi presented an alibi defense—he never contested the cause of death for either victim. According to Alabama caselaw, the autopsy report was properly admitted into evidence under the

business-record exception to the hearsay rule." *Id.* at 932. The court noted that defense counsel's closing argument acknowledged that the defense did not contest that Mrs. Smith-Sharifi and Mr. Brown were intentionally killed—only that Mr. Sharifi did not cause their deaths. *Id.* The appeals court also concluded that any error in admitting the report "was harmless beyond a reasonable doubt." *Id.*

*Analysis*

Contrary to Mr. Sharifi's arguments, admitting Dr. Glenn's autopsy report under the business records exception as nontestimonial hearsay was not "contrary to [] or . . . an unreasonable application of[] clearly established Federal law" for purposes of federal relief under 28 U.S.C. § 2254(d)(1).

As an initial matter, AEDPA "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established **at the time the state conviction became final**." *Williams*, 529 U.S. at 380 (emphasis added). A state court decision about a question that Supreme Court precedent leaves unresolved cannot satisfy either the "contrary to" or the "unreasonable application" standard of Section 2254(d)(1). *See Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005); *Wright*, 552 U.S. at 126. The Supreme Court has clarified:

> [R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language

> requires an examination of the state-court decision at the
> time it was made. It follows that the record under review
> is limited to the record in existence at that same
> time[,] *i.e.,* the record before the state court.

*Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). Thus, this court must consider

only those principles of law that were clearly established at the time of the state court

ruling on Mr. Sharifi's direct appeal in 2008.

Pursuant to the Confrontation Clause in the Sixth Amendment, "[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him." U.S. Const. amend. VI. "Testimonial statements of

witnesses absent from trial [may be] admitted only where the declarant is

unavailable, and only where the defendant has had a prior opportunity to cross-

examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

In *Crawford*, the Supreme Court determined that a trial court violated the

Confrontation Clause by admitting into evidence out-of-court statements made by

the defendant's wife to police officers, when those statements concerned the

altercation during which her husband allegedly stabbed the victim (the offense for

which her husband was on trial). *See id.* at 38, 68. The Court explained that the

Confrontation Clause bars the admission of "[t]estimonial statements" made by a

non-testifying witness, unless the witness is unavailable, and the defendant had a

prior opportunity to cross-examine him. *Id.* at 59. The Court was careful to limit this

rule to testimonial evidence, although the court left "for another day any effort to

spell out a comprehensive definition of 'testimonial.'" *Id.* at 68. The Court did clarify that testimonial evidence includes "at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* With regard to nontestimonial hearsay, the Court endorsed allowing "the States flexibility in their development of hearsay law." *Id.*

*Crawford* therefore reflects uncertainty about which statements are testimonial, along with flexibility about nontestimonial hearsay, and offers no express guidance relating to autopsy reports. Accordingly, this court cannot find that, at the time of Mr. Sharifi's conviction in 2005 or at the time of the state appeals court ruling in 2008, there was "clearly established Federal law" classifying an autopsy report as testimonial evidence. 28 U.S.C. § 2254(d)(1).

Mr. Sharifi also relies on *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), *Mendelez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012), in support of his argument. *See* Doc. 1 at 79–81. These cases are distinguishable and were decided after the conclusion of Mr. Sharifi's direct appeal. Furthermore, the Eleventh Circuit—not the Supreme Court—decided *Ignasiak*. Thus, Mr. Sharifi has not identified any "clearly established Federal law" supporting habeas relief under 28 U.S.C. § 2254(d)(1). *See, e.g.*, *Cullen*, 563 U.S. at 182.

Alternatively, even if Mr. Sharifi is correct that clearly established federal law held that an autopsy report is testimonial hearsay, his argument that the admission of the autopsy report was not harmless error fails. Mr. Sharifi argues that the autopsy "report is the *only* evidence of Sarah Smith-Sharifi's cause of death. Without Ms. Smith-Sharifi's cause of death the State could not prove that Sarah Smith-Sharifi and Derrick Brown were murdered by one act or pursuant to one scheme or course of conduct." Doc. 1 at 82. Further, "without Dr. Glenn's report, there was no evidence that Sarah Smith-Sharifi's cause of death was a gunshot wound and there was no evidence of the location of her gunshot wounds." *Id.* at 82–83. Mr. Sharifi contends that "[b]ecause there was scant evidence to show the murders were part of the same scheme, it is impossible to conclude the improper admission of Dr. Glenn's report was harmless and did not contribute to Mr. Sharifi's conviction of capital murder." *Id.* at 83.

There are two different standards for evaluating harmless error, and "for a federal court to grant habeas relief, it must be true *both* that the state court's application of the . . . harmless beyond a reasonable doubt standard was objectively unreasonable *and* that the error had a substantial and injurious effect or influence on the verdict." *Mansfield v. Sec'y, Dep't of Corrs.*, 679 F.3d 1301, 1307–08 (11th Cir. 2012).

As acknowledged by the appeals court, Mr. Sharifi's "defense was that he was in Los Angeles, California at the time of the murders," *Sharifi I*, 993 So. 2d at 912, and "he never contested the cause of death for either victim," *id.* at 932. Defense counsel expressly acknowledged that the victims were dead and did not dispute that they were killed intentionally. *See id.*

The record also reflects that, upon reviewing both the report and the autopsy photographs, Dr. Craig, an expert witness, testified that he could independently conclude that Sarah died from "multiple gun shot wounds [to] the head." Doc. 11-8 at 5. Additionally, Mr. Howard testified at trial, was present for Mrs. Smith-Sharifi's autopsy, and took the autopsy photographs showing Mrs. Smith-Sharifi's head wounds. *See* Doc. 11-7 at 136, 167. Mr. Howard also testified that, during the autopsy, he found the partial copper bullet lodged in Mrs. Smith-Sharifi's skull. *Id.* at 167–68. Accordingly, there was sufficient evidence for the jury to conclude— separate and apart from the autopsy report—that Mrs. Smith-Sharifi died because of a gunshot to her head.

Mr. Sharifi asserts that the record contains only "scant" evidence that he murdered both victims pursuant to one scheme or course of conduct, Doc. 1 at 83, but this argument is not supported by the record. Multiple uncontested facts support the finding that both victims were killed as part of the same scheme or course of conduct. Both victims were found bound in plastic and cordage and were recovered

from the same river within days of each other. *Sharifi I*, 993 So. 2d at 912. The caliber of the bullets recovered from both bodies matched the caliber of bullets used by Mr. Sharifi's registered gun. *Id.* Mr. Sharifi purchased this gun on December 6, 1999—only a few days before the victims were last seen alive—and Huntsville police responded to a domestic dispute between Mr. Sharifi and Mrs. Smith-Sharifi on December 13, 1999. Doc. 11-20 at 15–16; *Sharifi I*, 993 So. 2d at 912. This same gun was in Mr. Sharifi's possession at the time of his arrest in Los Angeles. *Sharifi I*, 993 So. 2d at 912; Doc. 11-20 at 17. Forensic testing later indicated that Mr. Sharifi's gun was the murder weapon. *Sharifi I*, 993 So. 2d at 912. Also, at the time of his arrest, Mr. Sharifi had Mr. Brown's identification, license plate, and credit cards in his possession, *id.*, and Mrs. Smith-Sharifi's driver's license was found in the clothing on Mr. Brown's body. Doc. 11-20 at 18. This non-comprehensive list is more than "scant" evidence.

The appeals court's holding that any error in admitting the autopsy report "was harmless beyond a reasonable doubt" was not objectively unreasonable. *Sharifi I*, 993 So. 2d at 932; *see Mansfield*, 679 F.3d at 1307. When considering the record as a whole, any error also did not have "a substantial and injurious effect or influence on the verdict." *Mansfield*, 679 F.3d at 1307–08. Even in the absence of the autopsy report, ample evidence supported the jury's guilty verdict. Mr. Sharifi is not entitled to habeas relief on this claim.

### 5.  Mr. Sharifi's opportunity to testify

Mr. Sharifi asserts that he is entitled to habeas relief because the trial court deprived him "of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments" when it "did not give [him] the opportunity to testify during either phase of his capital murder trial." Doc. 1 at 83 (cleaned up). He argues that he wanted to testify, but he "was not asked during either phase of the trial if he wanted to testify, and defense counsel did not call him to testify in either phase." *Id.* The government answers that "[t]his claim is procedurally defaulted from this court's review because Sharifi failed to fairly present it to the state courts." Doc. 15 at 17. Mr. Sharifi asserts that he fairly presented this claim to the Rule 32 court when he raised it in the second *pro se* supplement to his Rule 32 petition. Doc. 22 at 28. Notably, the Rule 32 court struck that supplement from the record because of Mr. Sharifi's improper practice of filing *pro se* motions while represented by appointed counsel. *See id.*; Doc. 11-60 at 126–29.

Mr. Sharifi attacks the order striking his *pro se* filings as unsupported by independent and adequate state law. Doc. 22 at 27–29. Further, Mr. Sharifi asserts that the Rule 32 court's general refusal to review the claims found within the stricken materials prevented him from appealing the claims when challenging the Rule 32 court's summary dismissal of his amended petition. *Id.*

70

The analysis of this claim tracks the analysis of Part III.B.2. above. As with the earlier issue, Mr. Sharifi acknowledges that he raised this claim as an ineffective assistance of counsel claim and not as a due process claim. *See* Doc. 22 at 28. Raising this issue as an entirely different claim does not exhaust the claim in the state court. *See Kelley*, 377 F.3d at 1344–45. Furthermore, the trial court did not consider the claim as part of Mr. Sharifi's Rule 32 petition because it was included in a "supplement" that was filed in violation of the trial court's procedural directives, Doc. 11-60 at 126–27, and Mr. Sharifi did not raise the claim or the trial court's refusal to consider it in his Rule 32 appeal. For these reasons, this claim is procedurally defaulted.

The cause and prejudice exception to procedural default does not apply because Mr. Sharifi cannot show cause for failing to raise the claim. He was aware of the factual and legal basis for the claim, and no objective factor prevented him from raising the claim in the state courts. *See Murray*, 477 U.S. at 488. Mr. Sharifi is therefore not entitled to federal habeas relief on this claim.

### 6.  Failure to charge the jury on lesser included offenses

Mr. Sharifi claims that his due process rights were violated when "[t]he trial court failed to charge the jury on lesser included offenses." Doc. 1 at 85 (cleaned up). He argues that the jury should have been charged on "the lesser included offense of intentional murder." *Id.* Mr. Sharifi acknowledges that "[d]uring trial, [he] told

his attorneys to ask the court **not** to give a jury instruction on lesser included offenses." *Id.* at 86 (emphasis added). He argues that his counsel should not have followed his directive. *Id.* He contends that the trial court's failure to instruct the jury on lesser included offenses violated *Beck v. Alabama*, 447 U.S. 625 (1980), and that the appeals court unreasonably applied *Beck* in Mr. Sharifi's direct appeal. Doc. 1 at 86–88.

*Relevant Background*

During a pre-trial motion conference, Mr. Sharifi's counsel argued that "lesser included offense[s] [were] not authorized" under *Holladay v. State*, 549 So. 2d 122 (Ala. Crim. App. 1988), and should not be included in the jury charge. Doc. 1 at 86 (citing Doc. 11-4 at 151). Before closing arguments in the guilt phase of the trial, defense counsel again requested that the trial court exclude any lesser-included offenses from the jury charge and again invoked *Holladay*. Doc. 11-9 at 7–9. Defense counsel pointed to the factual similarities between Mr. Sharifi's case and *Holladay*. *See id.* at 9. The government suggested a lesser-included charge but then withdrew that suggestion after reading *Holladay*. *Id.* at 9–14, 18. The trial court initially "indicated that . . . unless the *Holladay* case dictated otherwise" it would charge the jury on the single, lesser-included offense of intentional murder. *Sharifi I*, 993 So. 2d at 937; *see* Doc. 11-9 at 11–15. "After researching the case, the [trial]

court declined to charge on any lesser-included offenses." *Sharifi I*, 993 So. 2d at 936. Neither party objected to this decision. Doc. 11-9 at 17–18.

Mr. Sharifi raised this claim on direct appeal. *Sharifi I*, 993 So. 2d at 935. The appeals court found that he "invited any error by specifically requesting that the court not instruct the jury on any lesser included offenses." *Id.* at 936. The court concluded that "there was no *Beck* violation" because "there was no reasonable theory from the evidence that would support a conviction for any lesser included offenses." *Id.* at 937–38. The appeals court found that Mr. Sharifi relied on the alibi-based defense of being in California at the time of the murders and that "[b]oth victims were killed with the same murder weapon, both were shot in the head, and both were found in the same body of water." *Id.* at 938. Thus the trial "court did not err in declining to charge the jury on any lesser offenses" under *Beck*, as "no reasonable theory from the evidence . . . would support a conviction for any lesser included offenses." *Id*.

*Analysis*

Mr. Sharifi argues that his due process rights were violated because the jury should have been instructed on the lesser included offense of intentional murder. Doc. 1 at 85. Mr. Sharifi claims that the appeals court unreasonably applied *Beck* because "the jury could have determined that the murders were not committed pursuant to one . . . course of conduct" from the evidence presented at trial or from

73

the prosecution's inability to "prove when . . . [or] where the victims were killed." Doc. 22 at 22.

Mr. Sharifi concedes that "the government is not required to prove that the victims were killed in the same place or at the same time to prove two murders occurred as part of [one] scheme or course of conduct." Doc. 1 at 93. Nonetheless, he argues that "[t]he lack of evidence regarding the time and place of [the victims'] death[s]" "is enough for a juror to have reasonable doubt that these two murders were committed during the same scheme or course of conduct, even if they were committed by the same person or with the same gun." *Id.* at 94.

To this end, Mr. Sharifi argues that the time of death of both victims remains a mystery. *See id.* at 91–92. He relies on evidence that Mrs. Smith-Sharifi's body was recovered "in the Tennessee River on December 26, 1999," and "Brown's body was found on January 1, 2000." *Id.* at 91. He also emphasizes that the coroner estimated that Mr. Brown's "body could have been in the river between two to six weeks," that "[Mr.] Brown was last seen alive on December 13, 1999," and that Mr. Sharifi presented defense witnesses whose testimony indicated they had spoken with Mrs. Smith-Sharifi as late as December 16, 1999. *Id.* Mr. Sharifi insists that "[t]here was . . . no evidence presented [about] where either victim was killed." *Id.* at 92. He asserts that "based on the evidence it is reasonable to conclude that the murders could not have occurred simultaneously." *Id.*

The death penalty may not "be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Beck*, 447 U.S. at 627. Stated another way:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

*Id.* at 637. "[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Id.* at 638. Inversely, a trial court is required to instruct the jury on lesser included offenses only "when there is a reasonable theory from the evidence to support it." *Roberts v. Comm'r, Ala. Dep't of Corrs.*, 677 F.3d 1086, 1094 (11th Cir. 2012) (cleaned up).

Viewing these standards in the light of Mr. Sharifi's heightened burden under AEDPA, habeas relief is not warranted. Numerous facts indicate that no reasonable view of the evidence could support a conviction for one murder but not the other. Both victims were shot by the same gun, which was registered to Mr. Sharifi and purchased by him shortly before the victims were last seen alive. *Sharifi I*, 993 So. 2d at 911–12. This murder weapon was in Mr. Sharifi's possession at the time of his

arrest in California. *Id.* at 912. Arresting authorities also recovered evidence connected to both victims from Mr. Sharifi, including Mr. Brown's driver's license, license plate, and credit card, as well as a pair of sandals with Mrs. Smith-Sharifi's blood. *Id.* Additionally, both bodies were recovered from the Tennessee River within days of one another, both bodies had gunshot wounds to the head, and both bodies were found wrapped in plastic and bound with cordage. *Id.*

In the light of this record, the appeals court did not unreasonably apply *Beck* when concluding that the evidence did not support charging the jury on a lesser offense. Furthermore, Mr. Sharifi invited any error. This claim does not support habeas relief under Section 2254(d).

### C. Ineffective Assistance of Counsel Claims

Mr. Sharifi asserts that his trial counsel failed to render effective assistance in multiple ways, and the impact of those deficiencies—both individually and cumulatively—justifies federal habeas relief. Doc. 1 at 98–100, 134–37.

As discussed in more detail in the subsections below, many of Mr. Sharifi's ineffective assistance of counsel claims were first raised in *pro se* supplements to his Rule 32 petition. As previously discussed, the trial court directed Mr. Sharifi not to file *pro se* pleadings, but he continually disregarded that instruction, and the Rule 32 trial court struck and refused to consider the *pro se* filings. Doc. 11-60 at 126–29. Mr. Sharifi did not raise either the specific claims or their dismissal in his Rule 32

appeal. *See* Doc. 11-61 at 2–39. Mr. Sharifi now argues that "claims presented in Mr. Sharifi's supplements are not procedurally defaulted, and the trial court's choice not to consider them is not an adequate bar to federal court review." Doc. 22 at 31. He further contends that, even if the claims are procedurally defaulted, the cause and prejudice exception applies. *Id.* at 30 n.9, 31–42.

"[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone*, 556 U.S. at 465. "A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Martinez*, 566 U.S. at 9.

The cause and prejudice exception to procedural default applies to ineffective assistance of counsel claims, just as it applies to other procedurally defaulted claims. *See id.* at 10. "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. In such cases, cause must be established by one of two circumstances. *Id.* at 14. The first circumstance arises "where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim

of ineffective assistance at trial," *id.*, and does not apply here. The second circumstance arises "where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*." *Id.* "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* "It is likely that most of the attorneys appointed by the courts are qualified to perform, and do perform, according to prevailing professional norms," which warrants enforcement of "procedural default in federal habeas proceedings." *Id.* at 15.

Mr. Sharifi procedurally defaulted his ineffective assistance claims to the extent that he did not properly raise them before the Rule 32 trial court and failed to pursue them on appeal from that court's summary dismissal. Without "fairly present[ing] every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review," Mr. Sharifi did not exhaust his state remedies in compliance with Section 2254(b)(1)(A). *Ward*, 592 F.3d at 1156 (cleaned up).

Mr. Sharifi's efforts to excuse his procedural default of his ineffective assistance of trial counsel claims, based on *Martinez*, fail. First, *Martinez*'s limited exception applies only to initial-review collateral proceedings and "does not concern

attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings." 566 U.S. at 16. Mr. Sharifi failed to raise these claims properly in his initial-review Rule 32 petition—and he also failed to appeal their dismissal.

Second, Mr. Sharifi cannot show cause based on his lack of counsel in the initial review proceedings. *See id.* at 14. He was represented by appointed counsel throughout almost all the post-conviction proceedings, with the exception of a window of approximately one-month between the withdrawal of one attorney and the appointment of a successor. *See Sharifi R.32*, 239 So. 3d at 606 & n.1.

Third, Mr. Sharifi cannot show that his appointed counsel's failure to raise select ineffective assistance claims was ineffective under *Strickland*. *See Martinez*, 566 U.S. at 14. Not only did Mr. Sharifi have appointed counsel, but he was represented by four different sets of attorneys over the course of his Rule 32 proceedings, all of whom had the opportunity to consider which claims should be raised. For the reasons discussed in more detail below, the decision not to pursue these claims was not unacceptable under *Strickland*.

Mr. Sharifi has failed to demonstrate that his abandoned ineffective assistance claims are equitably excepted from procedural default. Thus, to the extent Mr. Sharifi did not exhaust his state court remedies regarding his ineffective assistance claims, those claims are procedurally defaulted.

### 1.  Failure to protect Mr. Sharifi's right to testify

Mr. Sharifi asserts that his trial counsel rendered ineffective assistance during the guilt and penalty phases of his trial by failing to protect his right to testify. Doc. 1 at 98–100. Mr. Sharifi asserts that "[t]he trial court's reason for refusing to consider the claims is inadequate to bar federal review," but he cites no authority to support that position and does not expand the argument—making only a conclusory statement. Doc. 22 at 28. He further argues that "his pro se pleading must be construed liberally by this Court to include a direct claim that his right to testify at both phases of his trial was denied." *Id.*

Mr. Sharifi did not exhaust his state court remedies for this claim. Mr. Sharifi asserts that he raised this claim in his second *pro se* Rule 32 supplement, which was stricken. *Id.* However, Mr. Sharifi's counsel properly raised this claim in the amended Rule 32 petition, Doc. 11-35 at 152–53, and the Rule 32 court expressly considered and rejected the claim, Doc. 11-60 at 126, 132. Mr. Sharifi then did not raise the claim on appeal from the Rule 32 court's dismissal. Doc. 11-61 at 2–39. The cause and prejudice exception to procedural default under *Martinez* cannot apply because it does not extend to "attorney errors in . . . appeals from initial-review collateral proceedings." 566 U.S. at 16. Because Mr. Sharifi did not exhaust his state court remedies, this claim is procedurally defaulted.

## 2. Counsel's effectiveness in the penalty and sentencing phases

Mr. Sharifi argues that he did not receive effective assistance during the penalty and sentencing phases of trial for various reasons—specifically (1) his counsel's failure to investigate, obtain, and present mitigating evidence, Doc. 1 at 100; (2) failure to object to the presentence investigation report, *id.* at 114; and (3) the cumulative effect of the preceding errors, along with counsel's failure to protect Mr. Sharifi's right to testify during these phases, *id.* at 115.

All of these arguments are procedurally defaulted. Additionally, even if Mr. Sharifi had properly raised these issues before the state court, he would not be entitled to relief under *Strickland*, as discussed in more detail in subsections a–c below.

## a. Failing to investigate, obtain, and present mitigating evidence

Mr. Sharifi asserts that his counsel rendered ineffective assistance by "failing to investigate, obtain, and present any mitigation evidence during the penalty phase of Mr. Sharifi's capital murder trial." Doc. 1 at 100 (cleaned up). Mr. Sharifi acknowledges that when he attempted to raise these issues in his Rule 32 proceeding, he did so via impermissible *pro se* supplements to his Rule 32 petition, and the state court struck the supplements. Doc. 22 at 29. Mr. Sharifi did not raise the claim or contest the trial court's order striking his supplements in the Rule 32 appeal. *See*

*generally* Doc. 11-61 at 2–39. Because Mr. Sharifi did not exhaust available state court remedies, this claim is procedurally defaulted.

Furthermore, even if this claim were excepted from procedural default, Mr. Sharifi cannot satisfy *Strickland*. Counsel made a strategic decision at the penalty phase to emphasize their inability to acquire mitigation evidence through travel to Iran. Doc. 1 at 100–01. That decision was not outside the bounds of professional norms as required by *Strickland*, and Mr. Sharifi is not entitled to federal habeas relief.

### b. Failing to object to the presentence investigation report

Mr. Sharifi alleges that his counsel were "ineffective for not objecting to the inadequate presentence investigation report." Doc. 1 at 114 (cleaned up). "Specifically, the [presentence investigation report] failed to include any information from the psychological examinations or information from the letter from Dr. Ali Baghbanian." *Id.* In Mr. Sharifi's direct appeal, the court noted *sua sponte* several omissions from the presentence report—including the omissions now identified by Mr. Sharifi in his habeas petition—but concluded that the omissions were harmless. *Sharifi I*, 993 So. 2d at 947–49. The appeals court reasoned that the omissions were harmless because "the circuit court had access to the omitted information." *Id.* at 949. Mr. Sharifi subsequently raised this argument in the first supplement to his Rule 32 petition, which was considered by the trial court, although

the trial court did not rule on the merits of that particular claim. Doc. 22 at 30; Doc. 11-34 at 172; Doc. 11-60 at 129. Mr. Sharifi did not raise this claim on appeal from the Rule 32 court's summary dismissal. *See generally* Doc. 11-61 at 2–39. He therefore did not exhaust his available state court remedies. However, even if he had exhausted his remedies, the appeals court's conclusion that the omissions were harmless was not an unreasonable application of law or an unreasonable determination of facts supporting habeas relief under Section 2254(d).

### c. Cumulative effect of errors

Mr. Sharifi contends that "[t]he cumulative effect of counsel's errors during the penalty phase of trial prejudiced [him]." Doc. 1 at 115 (cleaned up). Because of the procedural and substantive deficiencies of the related ineffective assistance of counsel claims, this claim must also fail.

### 3. Counsel's effectiveness in the guilt / innocence phase

Mr. Sharifi claims that his constitutional rights were violated because his "attorneys were ineffective in preparation for and throughout the guilt/innocence phase of Mr. Sharifi's trial." Doc. 1 at 118 (cleaned up). In support of this contention, he identifies five instances of alleged ineffective assistance of counsel. *Id.* at 118–37. The court discusses each instance in turn below and concludes that Mr. Sharifi is not entitled to habeas relief on these claims.

### a. Firearm examiner's testimony

Mr. Sharifi alleges that his counsel were ineffective because they failed to adequately challenge the firearm examiner's testimony. Doc. 1 at 118–23. He asserts that he raised this claim in his sixth *pro se* Rule 32 supplement, which was stricken. Doc. 22 at 30. However, he also raised this claim in his first *pro se* Rule 32 supplement, Doc. 11-34 at 166, which he properly filed while awaiting appointment of post-conviction counsel and which was not stricken. *See* Doc. 11-60 at 125–26.

The Rule 32 court expressly considered his first *pro se* Rule 32 supplement and rejected his ineffective assistance of counsel claims. *Id.* at 126, 132. Mr. Sharifi did not raise this claim on appeal from the Rule 32 court's summary dismissal. *See* Doc. 11-61 at 2–39. The claim is therefore procedurally defaulted and does not support habeas relief.

### b. Mr. Sharifi's absence or constructive absence

Mr. Sharifi alleges that his counsel were ineffective because they failed to object to his absence from critical stages of the court proceedings. Doc. 1 at 123–27. Mr. Sharifi asserts that he raised this claim in "multiple supplements to [his] Rule 32 Petition." Doc. 22 at 30. He did raise this claim in his first *pro se* Rule 32 supplement, Doc. 11-34 at 171–72; Doc. 11-35 at 8–20, which he properly filed and which the Rule 32 court considered. *See* Doc. 11-60 at 125–26. The Rule 32 court rejected this claim, *id.* at 126, 132, and Mr. Sharifi did not raise the claim on appeal

from the Rule 32 court's summary dismissal. *See* Doc. 11-61 at 2–39. The claim is therefore procedurally defaulted and does not support habeas relief.

### c. Charging the jury on lesser included offenses

Mr. Sharifi claims that his counsel rendered ineffective assistance when they failed to ask the trial court to include lesser included offenses in the jury instructions. Doc. 1 at 128–31. Mr. Sharifi asserts that he raised this claim in his sixth *pro se* Rule 32 supplement. Doc. 22 at 30–31 (citing Doc. 11-36 at 29). The trial court did not consider the sixth supplement in its ruling on Mr. Sharifi's Rule 32 petition, since Mr. Sharifi filed the supplement in violation of the court's instructions. Doc. 11-60 at 126–28. In addition to failing to properly raise this claim before the Rule 32 court, Mr. Sharifi did not raise this claim—or its dismissal—in argument on appeal from the Rule 32 court's summary dismissal. *See generally* Doc. 11-61 at 2–39. Therefore, the claim is procedurally defaulted.

Mr. Sharifi cannot show cause and prejudice to overcome procedural default on this issue. His Rule 32 counsel were not deficient under *Martinez* and *Strickland*, since this claim lacks merit, as discussed in Part III.B.6 above.

### d. State's peremptory challenges

Mr. Sharifi argues that his attorneys "were ineffective for failing to object to the State's use of peremptory challenges to remove women from the jury because of their gender." Doc. 1 at 131 (cleaned up). The government used twenty of its twenty-

five strikes to remove women. *Id.* at 132; Doc. 11-22 at 22–28. Mr. Sharifi's petit

jury ultimately included six women and six men, with one male and one female

alternate. Doc. 11-22 at 22–28. Mr. Sharifi asserts that he was deprived of his right

to effective assistance of counsel when his trial counsel failed to raise a timely

objection under *J.E.B. v. Alabama*, 511 U.S. 127, 146 (1994), which extends the

framework established for claims of racially discriminatory strikes in *Batson v.

Kentucky*, 476 U.S. 79 (1986), to claims of gender discrimination in strikes. *See* Doc.

1 at 131–34.

       *Relevant Background*

       This issue was raised by Mr. Sharifi on direct appeal and in his Rule 32

petition. On direct appeal, the Court of Criminal Appeals rejected this claim, noting

that Mr. Sharifi did not identify "any specific jurors who were improperly struck,"

and the court's own review found "no inference that the prosecutor was engaged in

purposeful discrimination toward . . . female prospective jurors." *Sharifi I*, 993 So.

2d at 928.

       In the Rule 32 proceeding, the Court of Criminal Appeals determined that this

"claim was not pleaded with sufficient specificity to satisfy the requirements in"

Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. *Sharifi R.32*,

239 So. 3d at 610.[1] Specifically, "Sharifi alleged that the State used 20 of its 25 strikes against women . . . but he failed to allege the composition of the venire or the petit jury." *Id.* The appellate court also found Mr. Sharifi's allegation "that the Madison County District Attorney's Office [had] a history of . . . gender discrimination" was insufficient, where "only one of the cases Sharifi cited involved gender discrimination, and there was no finding in that case that any gender discrimination actually occurred." *Id.* at 611. The court found that Mr. Sharifi's "limited factual pleadings" were insufficient to "indicate that the struck jurors shared only the characteristic of gender." *Id.* In upholding the trial court's summary dismissal of this claim, the appeals court concluded that Mr. Sharifi "failed to plead sufficient facts indicating that the State violated either *Batson* or *J.E.B.* when exercising its peremptory strikes and, thus, failed to plead sufficient facts indicating that his trial counsel were ineffective for not raising a *Batson* and/or *J.E.B.* objection at trial." *Id.*

*Analysis*

Under the *J.E.B.* and *Batson* framework, "the defendant must make out a prima facie case by showing that the totality of the relevant facts give rise to an

---

[1] In his Rule 32 appeal, Mr. Sharifi argued that his counsel were ineffective for failing to object to the State's peremptory challenges on the basis of both gender and race. *See Sharifi R.32*, 239 So. 3d at 610. However, his petition before this court narrows the issue to only gender. *See* Doc. 1 at 131–34.

inference of discriminatory purpose" before "the burden shifts to the State to explain adequately the . . . exclusion by offering permissible [gender]-neutral justifications for the strikes." *Johnson v. California*, 545 U.S. 162, 168 (2005) (cleaned up); *see also Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330, 1343–44 (11th Cir. 2019) (applying the same burden shifting framework to a gender-discrimination claim). "[I]f a [gender]-neutral explanation is tendered," the final step requires the [trial] court to "decide . . . whether the opponent of the strike has proved purposeful . . . discrimination." *Smith*, 924 F.3d at 1343 (quoting *Johnson*, 545 U.S. at 168).

To sufficiently plead discrimination, Mr. Sharifi must compare female venire members who were struck by the government with male members who were not struck. *See Wood v. Allen*, 542 F.3d 1281, 1288–89 (11th Cir. 2008). Furthermore, "the inference of discrimination is weakened where, as here, the state accepts jurors in the allegedly targeted group." *Ledford v. Warden, Ga. Diagnostic Prison*, 975 F.3d 1145, 1156 (11th Cir. 2020) (reasoning that acceptance of "female jurors, even in small numbers, where a different allocation of strikes could have reduced female participation even further, tends to undermine the inference that those women who were peremptorily excluded were targeted on account of their gender"). When an "underlying substantive claim . . . lack[s] merit . . . any deficiencies of counsel in failing to raise or adequately pursue them cannot constitute ineffective assistance of counsel." *Owen v. Sec'y, Dep't of Corrs.*, 568 F.3d 894, 915 (11th Cir. 2009).

88

The appeals court correctly recognized that this claim was insufficiently pleaded in Mr. Sharifi's Rule 32 petition. Furthermore, half of Mr. Sharifi's petit jury was ultimately composed of women, which undermines an inference of discrimination. His counsel cannot be faulted for failing to raise a meritless objection.

For these reasons, Mr. Sharifi has not shown that the state court decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). He is not entitled to federal habeas relief on this claim.

### e. Cumulative effect of errors

Mr. Sharifi asserts that "[t]he cumulative effect of his counsel's errors during the guilt/innocence phase of trial prejudiced Mr. Sharifi." Doc. 1 at 134. Mr. Sharifi did not expressly raise this particular claim in the state court proceedings, although he did make an ineffective assistance of counsel claim in his *pro se* Rule 32 petition. *See* Doc. 11-33 at 23–24. Even if we assume the claim was properly raised in the Rule 32 petition, that court expressly rejected his ineffective assistance claim, Doc. 11-60 at 126, 131–32, and Mr. Sharifi did not raise this specific claim in argument on appeal from the Rule 32 court's summary dismissal, *see* Doc. 11-61 at 2–39. Mr. Sharifi therefore did not exhaust his state court remedies, and this claim is procedurally defaulted. Furthermore, given the procedural and substantive

inadequacies of Mr. Sharifi's other ineffective assistance claims, this "cumulative effect" claim cannot stand.

### D. Constitutionality of Mr. Sharifi's Death Sentence

Mr. Sharifi argues that the state courts incorrectly applied the standards of *Ring v. Arizona*, 536 U.S. 584 (2002). Doc. 1 at 137–45. In *Ring*, the Supreme Court held that the Sixth Amendment guarantees that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. Mr. Sharifi asserts that his death sentence violates *Ring* because the state trial judge—not the jury—found the specific aggravating fact that authorized his death sentence and found that this aggravating fact outweighed the mitigating circumstances. *See* Doc. 1 at 137–40.

*Relevant Background*

The jury convicted Mr. Sharifi on one count of capital murder for the intentional killings of both victims "pursuant to one scheme or course of conduct." *Sharifi I*, 993 So. 2d at 911; *see* Ala. Code §§ 13A-5-40(a)(10); 13A-6-2(a)(1). This capital offense has a corresponding aggravating circumstance that is applicable when "the defendant intentionally caused the death of two or more persons . . . pursuant to one scheme or course of conduct." Ala. Code § 13A-5-49(9).

At the conclusion of Mr. Sharifi's penalty-phase, the jury voted ten-to-two in favor of imposing the death sentence. *Sharifi I*, 993 So. 2d at 911. After conducting a separate sentencing hearing, the trial court sentenced Mr. Sharifi to death. Doc. 11-10 at 103–07. The trial judge found that the jury's unanimous guilt-phase verdict was "supported by the evidence." Doc. 11-20 at 20. The trial judge also found this verdict established beyond a reasonable doubt that one aggravating circumstance existed—namely, that Mr. Sharifi murdered "two or more persons . . . pursuant to one scheme or course of conduct." *Id.* (emphasis omitted).

Next, the trial judge "entered specific findings" regarding the "existence . . . of aggravating . . . and . . . mitigating circumstance[s]." *Id.* at 20. The trial judge found one statutory mitigating circumstance: Mr. Sharifi "had no significant history of prior criminal activity." *Id.* at 20–21. Additionally, the trial court considered "all aspects" of Mr. Sharifi's character, including "records and any of the circumstances that [Mr. Sharifi] offered in mitigation." *Id.* at 22. After weighing the mitigating circumstances against the single aggravating circumstance, the trial judge found "that the aggravating circumstances of this offense clearly outweigh any mitigating circumstances . . . even if all the mitigating circumstances . . . were . . . proven." *Id.* at 22–23. Based on these findings, the trial judge sentenced Mr. Sharifi to death. *Id.* at 23.

On direct appeal, the Alabama Court of Criminal Appeals rejected Mr. Sharifi's argument "that Alabama's death-penalty statute violates *Ring v. Arizona*." *Sharifi I*, 993 So. 2d at 940. The appeals court reasoned, "The appellate courts of this State have consistently held that the United State[s] Supreme Court's decisions in *Apprendi* and *Ring* did not invalidate Alabama's death-penalty statute which places the ultimate determination of the defendant's sentence in the hands of a trial judge and not a jury." *Id.* The appeals court explained that the Alabama Supreme Court has repeatedly rejected this argument, holding that "the jury's verdict finding a defendant guilty of capital murder during the guilt phase of his trial[] indicated that the jury had unanimously found a proffered aggravating circumstance included within [Alabama's legal] definition of the . . . [capital] offense charged in the indictment." *Id.* at 941 (cleaned up).

In his habeas petition, Mr. Sharifi argues that under Alabama's pre-2017 capital sentencing system, "a finding that an aggravating circumstance existed was *not* the only finding necessary to impose a death sentence." Doc. 22 at 24. He claims that even had a jury found—beyond a reasonable doubt—any number of aggravating circumstances, "a defendant could not receive a death sentence . . . [absent the jury's unanimous finding that] mitigating circumstances . . . did not outweigh the aggravating circumstances [beyond a reasonable doubt]." Doc. 22 at 24–25.

Mr. Sharifi alleges that, contrary to *Ring*, his sentencing "jury did not determine beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances." *Id.* at 25. Thus, Mr. Sharifi maintains that he is entitled to habeas relief under 28 U.S.C. § 2254(d)(1) because the state court's decision involved an unreasonable application of *Ring*. *Id.* at 24–25.

*Analysis*

To warrant habeas relief under Section 2254, Mr. Sharifi must show that the state court's ruling was "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. He cannot meet that standard on this claim.

Nothing in *Ring* forbids the use of an aggravating circumstance implicit in a jury's unanimous verdict to impose a death sentence. Indeed, *Ring* specifically left open this possibility. *See Ring,* 536 U.S. at 609 n.7 ("We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict.").

Mr. Sharifi has not cited any Supreme Court precedent that extends *Ring* to prohibit a trial judge from considering aggravating circumstances implicit within the jury's verdict or to require the jury to weigh the aggravating and mitigating circumstances. Thus, Mr. Sharifi has not established that the appeals court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,"

93

*Harrington*, 562 U.S. at 103, nor that the appeals court's rejection of his claim was an objectively unreasonable application of *Ring*. Mr. Sharifi is therefore not entitled to habeas relief on this claim.

### IV.   Mr. Sharifi's Request for an Evidentiary Hearing

Mr. Sharifi attached multiple evidentiary submissions to his Section 2254 petition and his reply brief and asks this court to consider them in support of his request for an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 Cases. *See generally* Docs. 1-1 to 1-5; Doc. 22-1; Doc. 1 at 146. "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2254 Cases in the United States District Courts.

Rule 7 permits a habeas court to "direct the parties to expand the record by submitting additional materials relating to the petition." Here, Mr. Sharifi offered his evidentiary submissions without this court's instruction. *See* Docs. 1-1 to 1-5. Because these submissions were accepted by this court in lieu of a formal evidentiary request, this court now considers whether Mr. Sharifi's petition, pleading, and accompanying submissions warrant an evidentiary hearing. The court has reviewed all such documents.

In a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). A petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* "There is an even higher bar for excusing a prisoner's failure to develop the state-court record." *Shinn v. Ramirez*, 596 U.S. 366, 381 (2022). In such circumstances, an evidentiary hearing is permissible only if the claim relies on either (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2); *see also Shinn*, 596 U.S. at 381. Even if a prisoner can meet one of these exceptions, "he also must show that further factfinding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the crime charged." *Shinn*, 596 U.S. at 381 (quoting 28 U.S.C. § 2254(e)(2)(B)). "[E]ven if all of these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence." *Id.*

The equitable rule set forth in *Martinez* does not expand the "narrow limits" set forth in 28 U.S.C. § 2254(e)(2) that govern when a federal court can consider a defaulted claim and allow a petitioner to introduce new evidence in support of that claim. *Shinn*, 596 U.S. at 371. Those limits still apply when "a prisoner's state

postconviction counsel negligently failed to develop the state-court record." *Id.* "[U]nder § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Id.* at 382. "In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 384.

Mr. Sharifi bears responsibility for any failure by his counsel in developing the post-conviction record. *See id.* at 383. Mr. Sharifi has not met the requirements of Section 2254(e)(2) because he has not shown that his habeas claims rely on "a new rule of constitutional law" or newly discovered facts. 28 U.S.C. § 2254(e)(2)(A)(i)–(ii). Accordingly, this court finds an evidentiary hearing is unwarranted.

## V.    Conclusion

For the reasons stated above, this court finds that Mr. Sharifi's claims and request for an evidentiary hearing are due to be denied, and his Section 2254 petition is due to be dismissed. This court will enter an Order dismissing Mr. Sharifi's Petition for a Writ of Habeas Corpus, Doc. 1, contemporaneously with this Memorandum Opinion. The Respondent's Motion to Strike portions of Mr. Sharifi's supplemental brief on *Shinn v. Ramirez* is **DENIED**. Doc. 115.

Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the habeas petitioner. This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make the requisite showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003) (cleaned up).

This court finds that Mr. Sharifi has not met either standard. Accordingly, this court will deny Mr. Sharifi a certificate of appealability in the Order entered contemporaneously herewith.

**DONE** and **ORDERED** this 20th day of March, 2024.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE